**S.E.L. MADURO (FLORIDA), INC., Plaintiff–Appellant,**

v.

**M/V ANTONIO DE GASTANETA, f/k/a M/V MARIA ANTONIA, her engines, tackle, apparel, furniture, etc., et al., Defendants–Appellees.**

**No. 86–5839.**

United States Court of Appeals, Eleventh Circuit.

Dec. 14, 1987.

---

Timothy J. Armstrong, Armstrong & Mejer, P.A., Coral Gables, Fla., for plaintiff-appellant.

Philip V. Moyles, New York City, John Campbell, Michael T. Moore, Mark J. Buhler, Miami, Fla., for defendants-appellees.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and HODGES*, District Judge.

HATCHETT, Circuit Judge:

This appeal requires that we apply principles of *res judicata* and collateral estoppel to determine whether this *in rem* action for services rendered and goods provided to a vessel is barred by a previous action between the same parties arising out of the delivery of the same services and provi-

---

* Honorable William Terrell Hodges, Chief U.S. District Judge for the Middle District of Florida, sitting by designation.

sions. Finding that this lawsuit is not barred, we vacate, reverse, and remand.

## FACTS

S.E.L. Maduro (Florida), Inc. (Maduro) provided services and goods to the M/V Antonio de Gastaneta, a cargo vessel. Maduro, the appellant, is a Florida corporation with its principal place of business in Dade County, Florida. The appellees, Banco de Credito Industrial, S.A. (BCI) and Sociedad de Gestion de Buques, S.A. (SGB), are Spanish business entities owned and operated by the government of Spain, with their principal places of business in Spain. SGB is the current operator of the M/V Antonio de Gastaneta, the appellee vessel in this action. BCI claims to be the current owner.[1] All parties agree that Naviera Gorbea, a business entity organized under the laws of Spain, with its principal place of business in Spain, was the owner of the vessel from 1981 through 1985, the time period during which Maduro rendered services and provided necessaries to the vessel.

Naviera Gorbea chartered three vessels, the M/V Blas de Lezo, the M/V Bernardo de Zamcola, and the M/V Antonio de Gastaneta, to Compania Maritima Span–Chile, S.A. (Span–Chile), a Chilean entity engaged in transporting cargo by sea between North and South America. From August 4, 1981, through October, 1982, Maduro furnished stevedoring and other labor, materials, and supplies, constituting marine necessaries for all three vessels. In October, 1982, Span–Chile ceased doing business and Naviera Gorbea reclaimed the vessels.

On December 10, 1982, Jose L. Gervas, principal of Naviera Gorbea, and Leo McKay, the president of Maduro, met in Miami, Florida, to discuss the vessels' indebtedness to Maduro. All parties admit that this meeting took place; they disagree, however, as to what transpired during the meeting. According to Maduro, McKay informed Gervas that Naviera Gorbea's vessels which were chartered to Span–Chile, owed Maduro $595,016 for services rendered and necessaries provided to the vessels. According to Maduro, Gervas signed an agreement with Maduro, dated December 10, 1982, agreeing to pay the $595,016 debt. Maduro now alleges that the $595,016 charges give rise to a maritime lien against each of the vessels, because the charges were incurred not only by the charterer, but also by the owner.[2]

BCI and SGB, the current parties-in-interest, have a different view of what transpired at the December 10, 1982, meeting. They claim that McKay informed Gervas that Maduro had a claim for $595,000 for services rendered to the three Naviera Gorbea vessels. According to BCI and SGB, McKay asserted Maduro's maritime lien in the three Naviera Gorbea vessels based upon the services rendered to the charterer, Span–Chile. They insist that at this meeting McKay told Gervas that Maduro intended to arrest the Naviera Gorbea vessels *in rem* to seek enforcement of its maritime lien. Because the vessels were at that time under charter, and operating out of United States ports, Naviera Gorbea had an interest in preventing the arrest and detainment of the vessels. Thus, Gervas signed a contract with Maduro, on behalf of Naviera Gorbea, agreeing to the $595,-000 debt, and Maduro agreed not to foreclose its maritime lien on the three vessels.

Maduro denies that McKay ever claimed a maritime lien in the three Naviera Gorbea vessels based upon the services rendered at the request of the charterer, Span–Chile. Maduro further denies that McKay told Gervas that Maduro intended to arrest the Naviera Gorbea vessels *in rem* to seek enforcement of a maritime lien for services

---

1. Maduro disagrees with BCI and SGB. Maduro contends that BCI was named as administrator of the vessel, but that no documents exist to indicate an actual transfer of ownership in the vessel.

2. Maduro's corporate policy is clear: If there is a "no lien" provision in a charter agreement, pertaining to a particular vessel, Maduro employees do not render services unless the provision is waived. According to Maduro personnel who were responsible for supervising its services to the M/V Antonio de Gastaneta, Span–Chile never informed Maduro of any "no lien" provision in the charter agreement.

rendered. Naviera Gorbea subsequently refused to make payments, claiming that the document is merely an agreement to agree, rather than an enforceable contract.

On July 6, 1983, three months before filing its complaint in *Maduro I*, Maduro telexed Naviera Gorbea to inform Naviera Gorbea that it was not Maduro's intention to attach the vessels because such action would place Naviera Gorbea in a difficult position regarding its existing charter agreements.

## PROCEDURAL HISTORY

On October 12, 1983, Maduro filed a lawsuit in the United States District Court for the Southern District of Florida against Naviera Gorbea, S.A. and Jose L. Gervas, alleging breach of the December 10, 1982, contract. In *S.E.L. Maduro (Florida), Inc. v. Naviera Gorbea, S.A., & Jose L. Gervas*, 83–2562–CIV–Davis (hereinafter referred to as *Maduro I*), Maduro sought damages for breach of the contract resulting from the promise to pay for services rendered to the three Naviera Gorbea vessels.

Maduro's complaint in *Maduro I* alleged that Naviera Gorbea chartered the vessels to Span–Chile during 1981 and 1982, and that Maduro furnished stevedoring and other labor, materials, and supplies constituting marine necessaries for the vessels. Maduro also alleged that during December, 1982, Maduro representatives met with Gervas, and in consideration of Maduro's agreement to refrain from foreclosing its maritime lien on one or more of the vessels, Gervas executed a written agreement, or promissory note, on behalf of Naviera Gorbea. In Count I, Maduro alleged that it had sustained damage as a result of Naviera Gorbea's breach; in Count II, Maduro alleged that it sustained damage as a result of misrepresentations made by Naviera Gorbea and Jose L. Gervas.

*Maduro I* came on for trial, and the jury returned its verdict finding "no breach of contract by defendant."[3] On March 31, 1986, the district court entered judgment on the jury's verdict.

On August 28, 1985, Maduro filed this lawsuit (hereinafter referred to as *Maduro II*) seeking to recover $148,000 plus interest against the M/V Antonio de Gastaneta *in rem*. Maduro's complaint in this action alleges that it furnished stevedoring and other marine necessaries and supplies to the M/V Antonio de Gastaneta, creating a maritime lien in its favor. Maduro alleges

---

3. A joint pretrial stipulation in *Maduro I* enumerated the issues of law and fact to be tried. Among the issues of fact listed by the parties were:

14. Whether Maduro knew of clause 18 of the charter parties, the prohibition of lien clause, and if so, whether clause 18 barred Maduro's maritime lien.

\* \* \* \* \* \*

18. Whether Maduro has waived its maritime lien.

\* \* \* \* \* \*

Among the issues of law listed by the parties in *Maduro I* were:

11. Whether any no-lien provision in the charter parties applies.

\* \* \* \* \* \*

20. Whether Maduro ever acquired a valid maritime lien on the Naviera Gorbea vessels.
21. Whether Maduro was barred from asserting a maritime lien against Naviera Gorbea vessels as a result of the prohibition of lien clauses.

\* \* \* \* \* \*

23. Whether Maduro as a general agent was precluded from asserting a maritime lien against the Naviera Gorbea vessels.

In *Maduro I*, the following affirmative defenses were raised by Naviera Gorbea and jury instructions pertinent to these affirmative defenses were read to the jury:

A. Waiver: Maduro waived it maritime lien.
B. Lack of consideration: No valid maritime lien and thus no consideration for the December 10, 1982, contract.
C. Prohibition of lien clause: Maduro had knowledge of the prohibition of lien clause in the charter party.
D. General agency: As a general agent, Maduro had no maritime lien in the Naviera Gorbea vessels.
E. Fraudulent inducement: Maduro knew it had no maritime lien in the vessels and, therefore, Naviera Gorbea was fraudulently induced into signing the contract.
F. Failure to mitigate: Maduro failed to mitigate damages.

Although the parties stipulated to these issues, among others, of law and fact to be tried before a jury and although Naviera Gorbea raised these affirmative defenses, the jury made only one finding: that Naviera Gorbea was not liable for breach of contract.

that the vessel defaulted in its obligation to pay amounts due Maduro and that the vessel refused to remedy these defaults upon demand. Maduro seeks to foreclose on its maritime lien. BCI and SGB filed a Motion for Summary Judgment. The district court granted summary judgment in favor of BCI and SGB, finding that the judgment in the *in personam* action in *Maduro I* operates as an absolute bar to the *in rem* action in this case, *Maduro II*. Maduro appeals.

## ISSUES

Maduro raises two issues in this appeal: (1) whether the doctrines of *res judicata* or collateral estoppel bar an action *in rem* against a vessel where a prior action was brought *in personam* against the vessel's owner; and (2) whether the district court abused its discretion in ordering Maduro to pay to the M/V Antonio de Gastaneta certain expenses associated with this lawsuit.

## DISCUSSION

### 1. *Res Judicata*

*Res judicata* is claim preclusion; it refers to the preclusive effect of a judgment in foreclosing relitigation of matters that were litigated or could have been litigated in an earlier lawsuit. *I.A. Durbin, Inc. v. Jefferson National Bank*, 793 F.2d 1541, 1549 (11th Cir.1986); *Interstate Pipe Maintenance, Inc. v. FMC Corp.*, 775 F.2d 1495, 1497 (11th Cir.1985). The purpose of claim preclusion is to avoid multiple suits on identical claims between the same parties. *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767, 771 (1979); *Ray v. Tennessee Valley Authority*, 677 F.2d 818, 821 (11th Cir.1982).

■ For the doctrine of *res judicata* to be properly applied, four essential elements must be present: (1) the first action must result in a final judgment on the merits, (2) the decision must be rendered by a court of competent jurisdiction, (3) the parties to both actions, or those in privity with the parties, must be identical, and (4) the causes of action in both suits must be identical. *I.A. Durbin, Inc. v. Jefferson Na-*

*tional Bank*, 793 F.2d 1541, 1549 (11th Cir.1986). In *Durbin*, this court stated that "[t]he principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case. [Citation omitted; footnote omitted.] In determining whether the causes of action are the same, a court must compare the substance of the two actions, not their form." *I.A. Durbin*, 793 F.2d at 1549. In order to invoke *res judicata* as a shield to the instant action, BCI and SGB, representing the interests of the M/V Antonio de Gastaneta, must show that all four of the prerequisites enumerated above have been satisfied.

■ BCI and SGB contend that the judgment in *Maduro I* constitutes a final judgment on the merits, rendered by a court of competent jurisdiction, that the parties, involved in *Maduro I* and *Maduro II*, are identical and that the cause of action in *Maduro II* is "a slice of *Maduro I*," which has already been tried and resolved. They further contend that all the prerequisites have been satisfied and that *Maduro II* is barred by the judgment in *Maduro I*.

Applying the "primary right" test, however, we find with regard to the fourth prerequisite, that the causes of action are distinguishable. As Maduro contends, *Maduro I* involved a breach of contract claim against the vessel owner *in personam;* this action involves a statutory lien foreclosure against the vessel *in rem*.

Having reviewed the complaints in both *Maduro I* and *Maduro II*, the jury instructions from *Maduro I*, and the trial transcript from *Maduro I*, we find that Maduro actually presented two claims in *Maduro I*. The first is a claim for breach of an alleged contract or promissory note executed in connection with stevedoring and other marine necessaries which Maduro allegedly furnished to vessels owned by Gorbea; the second is a claim against Naviera Gorbea for fraudulently inducing Maduro to refrain from foreclosing alleged maritime liens on the vessels. The pretrial stipulation and the jury verdict from *Maduro I* indicate that only the breach of contract claim went to the jury; the district court's

judgment indicates that Maduro's claim for fraudulent inducement was dismissed on a directed verdict.

Having examined the issues in *Maduro I*, and the issues in *Maduro II*, we conclude that the primary right for which Maduro now seeks redress is different from the primary right for which it sought redress in *Maduro I*. In *Maduro I*, an action for breach of contract, the issues were: (1) whether Gervas and McKay had a meeting of the minds on December 10, 1982, (2) whether an enforceable contract was created, and (3) whether Naviera Gorbea breached that contract.

The jury in *Maduro I* returned a general verdict finding "no breach of contract by defendant." Naviera Gorbea and Jose L. Gervas presented seventeen affirmative defenses, five of which relate to the claim raised by Maduro in *Maduro II* and are listed in footnote 3.

The jury instructions address several of Naviera Gorbea and Gervas's affirmative defenses, as well as Maduro's breach of contract claim. The court addressed fraudulent inducement in the jury instructions, but did so in the context of the defendants' affirmative defenses. Thus, the jury found that the shipowner, Naviera Gorbea, could not be held liable *in personam* for breach of the alleged contract dated December 10, 1982.

The cause of action in *Maduro II* is altogether different. In this action, Maduro seeks to enforce its maritime lien *in rem* against the vessel.[4] As we stated in *Durbin*, we must compare the substance of the actions, not their form. Thus, we must look at the factual issues to be resolved in *Maduro II*, and compare them with the issues explored in *Maduro I*. In an action to enforce a maritime lien, the issues are: (1) whether Maduro rendered services to the M/V Antonio de Gastaneta, (2) whether the charges for those services are reasonable, (3) whether the services rendered to the vessel were "necessaries" within the meaning of the Maritime Lien Act, 46 U.S. C. § 971, and (4) whether the person who placed the order had authority to do so, either real, apparent, or statutorily presumed. *See Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161 (5th Cir.1984).

When the two actions are analyzed in this manner, it is clear that the primary right at stake in *Maduro I*, the right to the benefit of one's bargain, is not the same as the primary right at stake in *Maduro II*, the right to be compensated for services rendered. That the shipowner may escape contractual liability for debts of a chartered vessel does not extinguish the vessel's liability, giving rise to a statutory lien, for marine necessaries and supplies. The lien attaches to the vessel even if the vessel owner has not personally contracted. Federal Maritime Lien Act, 46 U.S.C. § 972; *see Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508 (11th Cir.1985); *Dixie Stevedores, Inc. v. Marinic Maritime Ltd.*, 778 F.2d 670 (11th Cir.1985). Thus, an action on a shipowner's promise to pay the debt of the vessel is different from an action against the vessel to recover the value of services rendered. The potential liabilities are separate and distinct. *See* Supplemental Rules for Certain Admiralty and Mari-

---

**4.** With respect to Maduro's claim against the vessel, sections 971 and 972 of the Maritime Lien Act provide, in pertinent part:

Any person furnishing repairs, supplies, towage, use of drydock or marine railway, or other necessaries to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of drydock or

marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted....

46 U.S.C. §§ 971–972.

Under these sections, a presumption arises that one furnishing marine necessaries to a vessel has acquired a maritime lien. *TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1139 (5th Cir.1983); *Gulf Trading & Transportation Co. v. M/V Hoegh Shield*, 658 F.2d 363, 368 (5th Cir. Unit A 1981), *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982).

time Claims, 28 U.S.C. Rule C(1)(b) (1966); *see Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920). Because the causes of action are not identical, *res judicata* does not bar *Maduro II*. We need not elaborate on the other prerequisites for *res judicata*.

## 2. Collateral Estoppel

Collateral estoppel is issue preclusion; it refers to the preclusive effect of a judgment in foreclosing the relitigation of a particular issue in a subsequent proceeding, if that issue was raised, litigated, and adjudicated in a prior lawsuit, and if the adjudication of the issue was necessary to the outcome of the prior lawsuit. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210, (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552, (1979).

■■■ Like the doctrine of *res judicata*, the doctrine of collateral estoppel also has certain prerequisites to its application: (1) the issue at stake must be identical to the one involved in the prior litigation, (2) the issue must have been actually litigated in the prior suit, (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action, and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. *I.A. Durbin, Inc. v. Jefferson National Bank*, 793 F.2d 1541, 1549 (11th Cir.1986). While *res judicata* forecloses all claims which might have been litigated in the prior lawsuit, collateral estoppel assigns a preclusive effect only to those issues actually and necessarily decided in the prior lawsuit. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). If the jury could have premised its verdict on one or more of several issues, then collateral estoppel does not act as a bar to future litigation of the issues. *United States v. Irvin*, 787 F.2d 1506 (11th Cir. 1986); *United States v. Ruggiero*, 754 F.2d 927 (11th Cir.1985).

■■ BCI and SGB contend that the district court properly applied the collateral estoppel doctrine. They argue that all four prerequisites are satisfied and the issue of whether a maritime lien exists in favor of Maduro was raised, litigated, and adjudicated in *Maduro I*.

The jury in *Maduro I* returned a general verdict, finding "no breach of contract by defendants." The jury was not asked, and therefore did not specifically answer, the question whether Maduro had a maritime lien against the M/V Antonio de Gastaneta. Likewise, the jury did not answer the question whether Maduro had waived any maritime lien rights. The general nature of the jury's verdict indicates that the third prerequisite for collateral estoppel has not been satisfied. Aware that certain issues surrounding the existence of a maritime lien were raised at trial, we are not persuaded that they were directly considered by the jury in reaching its verdict. To invoke collateral estoppel, we must be able to say that the determination of these issues in *Maduro I* was a critical and necessary part of the judgment in *Maduro I*. We cannot say this with certainty. Absent a specific determination regarding Naviera Gorbea's affirmative defenses, the judgment in *Maduro I* has no preclusive effect as to the maritime lien issue.

Since we are remanding this case to the district court for further evidentiary proceedings, we need not discuss the allocation of costs.

Accordingly, the judgment is vacated, the district court is reversed, and the case is remanded to the district court.

VACATED, REVERSED AND REMANDED.