A/S DAN–BUNKERING LTD., Plaintiff,

v.

The M/V ZAMET, Her Engines, Tackle, Etc., In Rem, Defendant.

CV 495–199.

United States District Court,
S.D. Georgia,
Savannah Division.

July 12, 1996.

Ordering Entering Judgement on pre–judgement interest and costs, Aug. 23, 1996.

David Furse Sipple, Chamlee, Dubus & Sipple, Savannah, GA, for plaintiff.

George Marion Earle, Hunter, Maclean, Exley & Dunn, Savannah, GA, for defendant.

Robert Strudwick Glenn, Jr., George Marion Earle, Hunter, Maclean, Exley & Dunn, Savannah, GA, for claimant.

## ORDER

EDENFIELD, Chief Judge.

Plaintiff A/S Dan Bunkering Ltd. ("DB") brought suit against the M/V Zamet to recover payment for bunker fuel it supplied the Zamet. Claimant Losinjska Plovidba–Brodarstvo ("Losinjska"), the Zamet's owner, defends the action. This case was dismissed pursuant to a settlement, but it was never consummated. Thus, the dismissal order was vacated, thereby resurrecting the cross motions for summary judgment.[1] 5/29/96 Order.

## I. Background

The relevant facts are for the most part undisputed. DB is engaged in the business of supplying bunker fuel to ocean-going vessels. In June 1994 Tradewind Chartering Ltd. requested DB to supply bunker fuel in San Francisco to the Zamet, which it had chartered. DB contacted LQM Petroleum Services, a fuel broker, to provide the bunker fuel. LQM contacted Petro America, Inc. ("PETRO"), which provided the fuel to the Zamet on June 4, 1994. Petro billed DB $21,981.62, and DB paid that amount. Petro also forwarded to Zamet's California agent a tax exemption certificate which would have

---

1. Both parties agreed at the June 7, 1996 pretrial conference that the Court had before it everything necessary to decide the issues of this case.

exempted the transaction from California's sales tax. Because Tradewind did not provide the essential information, the transaction's sales tax exemption was lost. Petro billed DB for the sales tax on the transaction, and DB paid $1,868.44 to satisfy the tax obligation. DB 3/26/96 Brief, Exh. B. DB claims $2,202.81 because it maintains that is the amount it was required by Danish law to charge Tradewind.

Again in July 1994, Tradewind contacted DB to provide bunker fuel for the Zamet in Savannah, Georgia. Again, DB contacted LQM, which contacted Colonial Oil to provide bunker fuel to the Zamet. Colonial provided the fuel on July 7, 1994, and billed DB for $24,917.88, Losinjska 3/1/96 Brief, Exh. A., which DB paid in full. DB then billed Tradewind $29,723.74, which Tradewind did not pay. Compl. Exh. C. DB did not obtain an assignment of lien from either Colonial or Petro. DB maintains it is due the amounts it paid for California sales tax, bunker fuel in Savannah, and interest and fees thereon.

## II. Summary Judgment Analysis

In *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir.1993), the Eleventh Circuit exhaustively explained the shifting burdens of proof with respect to F.R.Civ.P. 56 motions post-*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). 2 F.3d at 1116–17 Those principles shall be applied here.

DB asserts that it has a maritime lien on the Zamet under the Commercial Instruments and Maritime Lien Act ("CIMLA") since it provided the Zamet with necessaries. Losinjska argues for summary judgment on the ground that CIMLA was enacted to protect American suppliers of goods as opposed to foreign suppliers like DB. Further, Losinjska argues that the subcontractors Colonial and Petro are the only entities which could possibly have a maritime lien since they actually supplied the bunker fuel. Because they have been paid in full (by DB), and DB did not obtain an assignment of the maritime liens, Losinjska maintains that no maritime lien could possibly exist. Losinjska asserts that DB's claims are subrogated to those of the subcontractors and, as such,

DB's only action under maritime lien law would be for either advances or assignments. Thus, the Court will address DB's motion first. If DB has a valid maritime lien, then Losinjska's motion will be moot.

■ CIMLA states that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—(1) has a maritime lien on the vessel...." 46 U.S.C. § 31342(a). To establish a maritime lien, DB must prove it (1) rendered services to the Zamet, (2) charged a reasonable price for the services, (3) provided "necessaries" within the meaning of the Maritime Liens Act, 46 U.S.C.App. § 971, and (4) had authority to provide the services from a person authorized to do so. *S.E.L. Maduro v. M/V Antonio De Gastaneta*, 833 F.2d 1477, 1482 (11th Cir.1987).

Losinjska argues that DB did not render services or provide necessaries to the Zamet, but that the subcontractors are the entities that actually, physically provided the bunker fuel. Thus, Losinjska asserts, the subcontractors are the appropriate lienors and DB has no claim since it did not obtain an assignment of the lien from the subcontractors when it paid the invoices. Also, Losinjska asserts the doctrine of laches, claiming it has been prejudiced by DB's delay in bringing this action.

### A. Whether DB Has a Maritime Lien

■ The only issue is whether DB has a maritime lien notwithstanding its payment to the subcontractors that provided the bunkers without obtaining an assignment from them. Losinjska cites *Tramp Oil and Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 45 (1st Cir.1986) to support its assertion that DB cannot assert a lien against the vessel because it did not directly provide the bunkers to the ZAMET. Thus, the precise issue is whether DB "provided" the bunkers to the ZAMET and can assert a maritime lien for that provision, or whether it must have first obtained an assignment from the subcontractors to assert a lien.

In *Tramp Oil* the ship's charterer ordered bunker fuel through a fuel broker, J & L, which was in a position similar to DB. The

broker contacted Tramp Oil, an intermediary broker, who contracted with Exxon to supply fuel. Exxon caused Colonial Oil to actually provide the bunkers to the vessel. Tramp paid Exxon, which in turn paid Colonial. The charterer paid J & L, but J & L only partially paid Tramp. Tramp sought to assert a maritime lien on the vessel.

In deciding that Tramp could not assert a lien against the vessel, the court stated that it is "unfair to the vessel to extend the availability of a maritime lien directly to an intermediate broker *unknown to the vessel, particularly when the vessel has made a prompt and full payment for its supplies.*" *Tramp Oil*, 805 F.2d at 46 (emphasis added). Thus, *Tramp Oil* is inapposite to this case because DB is not an intermediary supplier or unknown the ZAMET, but dealt directly with the charterer. Furthermore, the payment made by Tramp was at best on the implied order of someone with authority since Tramp was an intermediary and had not dealt directly with the charterer. Here, DB ordered the bunker fuel on the direct order of someone with authority: Tradewind. *See* Losinjska Stmt. Facts at ¶¶ 3, 10.

Courts have upheld liens on behalf of fuel brokers that dealt directly with the vessel or charterer even though the brokers never held actual title to the bunkers, but contracted another entity to deliver them. In *Exxon Corp. v. Central Gulf Lines, Inc.*, 780 F.Supp. 191 (S.D.N.Y.1991), Exxon guaranteed payment for oil delivered to a charterer by a third party in Saudi Arabia. Exxon and the charterer had a forty year business relationship. The *Exxon* court held that, although Exxon never held title to the fuel or was technically the seller, it nevertheless had provided bunkers to the vessel within the meaning of CIMLA. *Id.* at 194.

In *Ceres Marine v. Harmen Oldendorff*, 913 F.Supp. 919 (D.Md.1995), a stevedore provided services to two vessels both directly and through subcontractors. When the vessels' charterer did not pay the invoices, the stevedore attempted to assert maritime liens on the vessels pursuant to CIMLA. Defending the action, the vessels' owner claimed that a contractor could not obtain a CIMLA lien for services provided to ships by a sub-

contractor. The court rejected that argument, holding instead that the services provided by the subcontractors were provided pursuant to the contractor's agreement with the charterer. Therefore, the contractor had "provided" the services within the meaning of the act on the authority of a person with authority to create a lien. *Id.* at 923.

The DB–Losinjska situation is more akin to the *Ceres* and *Exxon* cases than *Tramp Oil.* Colonial Oil provided the bunkers to Losinjska pursuant to the contract the charterer had with DB. Thus, like the *Ceres* and *Exxon* cases, DB was the "provider" of the bunkers within the meaning of CIMLA even though it never had title to them. DB therefore is entitled to a maritime lien under CIMLA just as it would have been had it physically delivered the fuel to the ship.

Losinjska characterizes the issue as whether DB acquired the lien claim of Petro and Colonial Oil, the subcontractors that physically provided the bunkers. Losinjska argues that only one lien could have arisen from each of the two transactions, and that would have been created in favor of Colonial and Petro. While both parties agree that Colonial and Petro would have acquired a lien for providing the bunkers, the Court is not bound by that concession. In fact, it is conceivable that neither Colonial nor Petro would have a maritime lien for DB to acquire, reinforcing the fact that DB was a provider of services under CIMLA. *Bonanni Ship Supply, Inc. v. U.S.*, 959 F.2d 1558, 1565 (11th Cir.1992) (subcontractor providing services to naval vessel at behest of contractor was not maritime lienor because it was not acting on authority of person authorized to act for the vessel). Under the holdings in *Exxon* and *Ceres*, it is unnecessary for DB to acquire a lien from Petro and Colonial; rather, its lien arises of its own force by virtue of DB providing necessaries to the ZAMET.

**B. Laches**

Losinjska next asserts the doctrine of laches, claiming it has been prejudiced by DB's delay in bringing this action. "Laches is an equitable principle terminating claims which are asserted after an inexcusable delay and which result in prejudice to the party

against whom the claim is asserted." *Trivizas v. Tanjong Shipping Co.,* 1982 A.M.C. 2520 (S.D.N.Y.1982). The crucial element warranting invocation of laches is the damage incurred by the owner of the vessel. 2 Benedict on Admiralty § 62 at 5–10. Thus, innocent owners in the position of a bona fide purchaser who had no notice of a lien incurred against the vessel prior to purchasing it can generally assert the laches defense. *John W. Stone Oil Dist. v. M/V MISS BERN,* 663 F.Supp. 773, 778 (S.D.Ala.1987) (lien "claim will lapse in a much shorter time and the court will undertake a more rigid scrutiny of the circumstances of the delay in cases where the vessel is in the hands of a bona fide purchaser as opposed to cases where there has been no change in ownership").

■ There has been no change in ownership in this case. Losinjska asserts that a delay of roughly one year from the time DB performed services for the vessel and the time it filed this suit asserting a maritime lien was unreasonable. Whether or not it was unreasonable, Losinjska is unable to show that it was prejudiced by the delay. Losinjska's owners filed suit against the charterer in April 1995, four months prior to DB bringing suit. The owners obviously were aware of the charterer's misfortunes, and had even taken steps to protect their claims against the charterer. Thus, the owners have not demonstrated how the delay prejudiced them.

Furthermore, DB explained the delay. The ZAMET did not dock in an American port between November 1994 and July 1995. In November of 1994, DB's invoice was only ninety days old. Thus, the delay was not per se unreasonable, especially since Losinjska has not shown any prejudice from it. *See South Carolina Ports Auth. v. M/V TYSON LYKES,* 837 F.Supp. 1357, 1369 (D.S.C.1993), *aff'd* 67 F.3d 59 (4th Cir.1995); 2 Benedict on Admiralty § 62 at 5–11 (7th ed. 1995) ("If the vessel is abroad or out of the claimant's reach for a substantial portion of the time between the accrual of the lien and the attempt to enforce it, laches will not be an adequate defense"). Therefore, the Court rejects Losinjska's assertion of laches as a defense to DB's maritime lien.

## C. Damages

The final dispute between the parties is over the amount of damages. DB claims the invoice amount of 29,723.74 for the Savannah sale, sales tax on the California sale of 2,202.81, and attorney's fees. Losinjska values DB's claim for the Savannah sale at $24,917.88 and $1,868.44 for California sales tax, claiming that no commission or mark-up should be allowed for these amounts.

### 1. Savannah Transaction

■ Losinjska argues that DB is not allowed the full $29,723.74 for the necessaries provided to the ship in Savannah; rather, DB is only entitled to a lien for the actual costs it incurred in the transaction, i.e. the $24,917.88 it paid to Colonial. Citing *E.S. Binnings, Inc. v. M/V Saudi Riyadh,* 815 F.2d 660, 663 (11th Cir.1987), Losinjska contends that commissions are not recoverable under CIMLA. However, *Binnings* supports the proposition that maritime liens will not lie for agency contracts that are outside of the admiralty jurisdiction of federal courts. Losinjska does not cite, nor can the Court find, any authority for the proposition that providers of necessaries to ships are not entitled to any profit from the transaction. Thus, Losinjska's argument is without merit, and DB is entitled to recover $29,723.74 for the bunkers supplied in Savannah.

### 2. California Sales Tax

■ DB also seeks to recover $2,202.81 in California sales tax it incurred as a result of supplying bunkers to the ZAMET in San Francisco. Losinjska asserts that sales tax does not give rise to a maritime lien and that, if it does, DB is only entitled to $1,868.44, the amount of tax paid excluding the mark up DB added. In support of its proposition, Losinjska cites *Kesselring v. F/T Arctic Hero,* 1993 A.M.C. 447, 448 (D.Alaska 1992). In *Kesselring* the court held that the federal government could not obtain a maritime lien for taxes withheld from crewmembers' wages not remitted to the government. The court reasoned that a tax lien for unremitted payroll taxes was not maritime in nature. Con-

versely, the taxes due on fuel supplied to a vessel would constitute a portion of the cost of that fuel and would thus be included within CIMLA's provision of maritime liens for necessaries. Because DB presumably profited from the sale of the bunker fuel, the Court finds that DB is entitled to the actual sales tax paid of $1,868.44 without a mark up for additional profit.

### 3. Attorney Fees and Interest

DB also seeks to collect attorneys fees and interest on its claims. DB is directed to submit further briefing within thirty (30) days on whether these give rise to a maritime lien. Losinjska will have fifteen (15) days from the date on which DB's brief is served in which to respond.

## IV. Conclusion

For the foregoing reasons, DB's Motion for Summary Judgment is **GRANTED IN PART** and it is granted a lien against the M/V ZAMET in the amount of 29,723.74, representing bunkers supplied to the vessel at Savannah, and $1,868.44 for the unpaid sales tax on the bunkers supplied to the vessel in San Francisco. Losinjska's Motion for Summary Judgment is **DENIED.** The total lien amount thus far is $31,592.18. The Court reserves judgment on DB's request for a lien for the attorneys fees and interest.

### *ORDER AND JUDGMENT*

In its July 12, 1996 Order granting summary judgment in plaintiff's favor, the Court directed plaintiff to submit further briefing on whether attorney's fees and contractual interest give rise to a maritime lien. Plaintiff has now submitted a brief withdrawing its claim for attorney's fees and contractual interest but claiming prejudgment interest. Claimant has chosen not to submit a brief on the issue. The Court having considered plaintiff's brief and the applicable law hereby directs the Clerk to enter the following judgment:

IT IS ORDERED AND ADJUDGED that the Plaintiff, A/S Dan–Bunkering Ltd., recover of and from the Motor Vessel ZAMET *in rem* and her claimant Losinjska Plovidba–Brodarstvo DD. *in personam* the principal sum of $31,592.18 plus prejudgment interest and the costs of this action. Prejudgment interest shall be calculated at the rate of 7% per annum and shall run from the due dates of the two invoices involved: August 7, 1994 with respect to the Savannah bunkers (principal amount $29,723.74) and August 17, 1994 with respect to the sales tax on the San Francisco bunkers (principal amount $1,868.44). Therefore as calculated through August 23, 1996, the prejudgment interest is $4,252.52 with respect to the Savannah bunkers and the $263.68 with respect to the sales tax for a total of $4,516.20. The full amount of the judgment is $36,108.38 plus the costs of this action.