**GALEHEAD, INC., an Oregon Corporation, Plaintiff,**

v.

**M/V ANGLIA, in rem, Defendant.**

**No. 97–1229–CIV.**

United States District Court, S.D. Florida.

May 8, 1998.

Craig P. Kalil, Miami, FL, for Plaintiff.

Alvaro Mejer, Coral Gables, FL, for Defendant.

### ORDER DISMISSING COUNT I OF COMPLAINT AND ENTERING SUMMARY FINAL JUDGMENT IN FAVOR OF PLAINTIFF ON COUNT II OF COMPLAINT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon the parties' cross.motions for summary judgment. Owner of the Defendant vessel ("Owner") filed its motion on February 9, 1998, and Plaintiff filed its response/motion on March 13, 1998. Owner filed a response on March 30, 1998, and Plaintiff filed a reply on April 30, 1998.

### Factual Background

This is an *in rem* action for a maritime lien on the Defendant vessel, M/V Anglia ("Anglia"), arising from the failure of Anglia's charterer, Genesis Container Line ("Genesis"), to pay for bunkering or fueling services provided to Anglia on three separate occasions. Anglia is a vessel flagged under the laws of Cyprus and owned by a German corporation. At all relevant times, Genesis, a Cayman Islands corporation, was the time charterer of Anglia.

The first incident occurred on August 25, 1995, when Genesis engaged Polygon Energy Services, Inc. ("Polygon"), a Florida corporation, to obtain bunkers for Anglia at Port Everglades, Florida. Polygon, in turn, contacted Etablissment Asamar, Ltd. ("Asamar"), a Bermuda corporation, to supply the fuel. Asamar then engaged Coastal Refining and Marketing, Inc. ("Coastal"), who actually fueled Anglia on August 26, 1995. Owner contends that Coastal was the supplier of the fuel and Asamar was a mere broker, while Plaintiff contends that Asamar was the real seller of the fuel. Although the bunker confirmation prepared by Polygon lists Coastal as the "physical supplier" and Asamar as the "seller," the record is unclear as to which corporation, Coastal or Asamar, had actual title to the fuel. The cost of the bunkers, $26,075.75, was paid by Asamar to Coastal. Genesis failed to pay Asamar for the bunkers. On November 30, 1995, Asamar assigned its rights to the $26,075.75 from Genesis to Plaintiff, a collection agency.

On September 8, 1995, Genesis again engaged Polygon to obtain bunkers for Anglia in Houston, Texas. Polygon then contacted Asamar who engaged ChemOil Corp. ("ChemOil") and Marsh Distributing Company ("Marsh") to fuel the Anglia. ChemOil and Marsh supplied the fuel on September 11, 1995. Again, while the bunker confirmation prepared by Polygon lists ChemOil and Marsh as the "physical suppliers" and Asamar as the "seller," it is not clear which corporation held title to the fuel. Asamar paid ChemOil and Marsh $19,439.49 for the bunkers, but was not reimbursed by Genesis. On November 30, 1995, Asamar assigned its rights to the debt to Plaintiff.

On October 27, 1995, Genesis again contacted Polygon to procure bunkers for Anglia in Houston, Texas. Polygon then engaged ChemOil and Tesoro Petroleum Distributing Company ("Tesoro") to fuel Anglia. Again, although the bunker confirmation prepared by Polygon lists ChemOil and Tesoro as the "physical suppliers" and Polygon as the "seller," the record does not reveal which corporation had title to the fuel. Polygon paid ChemOil and Tesoro $24,376.00 for the fuel, but was not reimbursed by Genesis. On December 1, 1995, Polygon assigned its rights to the $24,376.00 to Plaintiff.

On April 24, 1997, Plaintiff filed a Complaint in this Court seeking to enforce the full amount of its maritime liens against Anglia. Owner moves for summary judgment on the ground that because of their status as brokers, Polygon and Asamar did not obtain a maritime lien on Anglia and thus could not assign a lien to Plaintiff.

### Legal Standard

Summary judgment is appropriate only where it is shown that no genuine dispute as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v.*

1. Owner also argues that Plaintiff may not proceed on the theory that a maritime lien arose by virtue of Asamar and Polygon providing an "advance" to Anglia. It does not appear, however, that Plaintiff premises its argument on the rule of advances. Rather, Plaintiff is claiming that Polygon and Asamar are providers of necessaries within the meaning of the Act. Thus, the Court need not concentrate on the advance issue. Nonetheless, it seems clear that Asamar is not

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the record as a whole could not lead a rational fact-finder to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Discussion

■ Owner contends that Polygon and Asamar did not procure maritime liens on Anglia because they were mere brokers of bunkering services, rather than suppliers. The Commercial Instruments and Maritime Lien Act ("Act") provides in pertinent part:

[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342. The parties agree that bunkers are necessaries. Furthermore, it is clear that Genesis, as the charterer of the vessel, had authority to procure necessaries for Anglia. *See id.* § 31341(a)(4)(B). The parties differ, however, on the issue of whether Polygon and Asamar were "person[s] providing necessaries to a vessel."[1] On the one hand, Owner asserts that providing brokerage services to a vessel is not the same as providing bunkering services. On the other hand, Plaintiff contends that Polygon and Asamar were the actual suppliers of the bunkering services.

entitled to a lien under an advance theory because it had no direct relationship with either Anglia or Genesis. *See Tramp Oil v. M/V Mermaid I,* 805 F.2d 42, 46 (1st Cir.1986) (discussed further *infra*). The Court need not discuss whether Polygon is entitled to a lien under an advance theory because the Court finds that it is entitled to a lien as a provider of necessaries within the meaning of the Act.

Whether fuel brokerage services give rise to maritime liens has been addressed extensively by the First Circuit in the seminal case of *Tramp Oil v. M/V Mermaid I*, 805 F.2d 42 (1st Cir.1986).[2] The relevant facts of *Tramp Oil* are as follows: The vessel Mermaid, through its master, asked its charterer, Logos, a Danish corporation, to procure bunkers. Logos in turn contacted J & L Bunkers, another Danish corporation, to supply the fuel. J & L contacted Tramp Oil, an English fuel broker, who entered into an agreement with Exxon to supply the fuel. Exxon then had Colonial Oil actually deliver the fuel to Mermaid in Savannah, Georgia. *See id.* at 44. The cost of the fuel was $91,360.14. Tramp Oil paid Exxon in full, and Exxon paid Colonial in full. Logos paid J & L in full, but J & L paid Tramp Oil only $45,000.00. After unsuccessful efforts to collect the balance, Tramp Oil sued in the district court to enforce a maritime lien on Mermaid. *See id.*

The First Circuit first observed that "[n]o one disputes that Exxon and Colonial, as direct suppliers of the fuel to the Mermaid, would be entitled to a maritime lien.... The question before us is whether Tramp acquired the suppliers' rights to the lien when it paid Exxon in full for the fuel." *Id.* As an initial matter, this Court observes that the First Circuit drew a sharp distinction between Exxon's role in the transaction and Tramp's role. The court was not clear, however, on the basis for this distinction. One might reason that Exxon had title to the fuel and was therefore a "supplier," whereas Tramp Oil did not have title and was merely a broker. The facts presented in the opinion, however, are silent as to who had title to the fuel. Thus, the opinion does not give an indication as to what critical factors distinguish "suppliers" from mere brokers or middlemen. Nonetheless, the court started with the premise that Tramp Oil was not a "supplier" of necessaries within the meaning of the Act.

The Court then analyzed whether Tramp Oil acquired the supplier's maritime lien when it paid for the fuel or made an "advance" on behalf of Mermaid. After an analysis of the rule of advances, the Court concluded that Tramp Oil did not acquire the lien via an advance because there was no evidence that Tramp Oil had the authority to pay for the fuel on behalf of the vessel. *See id.* at 45. The Court declined to imply an advance based on Mermaid's or Logos's fuel order because there was no direct relationship between Mermaid and Tramp Oil or Logos and Tramp Oil. *See id.* at 45–46. In reaching this conclusion, the Court observed that Tramp Oil could not assert that it had a relationship with Logos via J & L because there was no evidence that the relationship between J & L and Logos was an agency relationship or anything other than a contractual relationship for the purchase of fuel. *See id.* at 46.

The Court then considered Tramp Oil's contention that it acquired a lien on the vessel as a provider of necessaries within the meaning of the Act, even if it did not directly supply the bunkers. The court first observed that "[t]he primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services." *Id.* (citing *Gulf Trading & Transp. Co. v. Vessel Hoegh Shield*, 658 F.2d 363, 367 (5th Cir.1981) ("The congressional intent is that American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.")). The First Circuit accordingly ruled:

> With this purpose in mind, and in light of the principle that maritime liens are to be strictly construed, we decline to extend the law for Tramp's benefit in the circumstances of this case. Tramp is a foreign broker, not an American supplier, and thus not the intended beneficiary of the Maritime Lien Act....
>
> We therefore think it unnecessary to protect American suppliers, and unfair to the vessel, to extend the availability of a maritime lien directly to an intermediate broker unknown to the vessel, particularly

---

**2.** The court in *Tramp Oil* analyzed 46 U.S.C. § 971, the predecessor statute to 46 U.S.C. § 31342.

when the vessel already has made a prompt and full payment for its supplies. *Id.* (citations omitted).

In ruling as it did, the First Circuit left open many doors regarding when a corporation involved in a bunker transaction is entitled to a maritime lien. For example, the court did not answer: (1) what distinguishes a supplier from a broker; (2) whether an American, as opposed to a foreign, broker is entitled to a lien; (3) whether a lien is available if the broker is known to the charterer but not the vessel; (4) whether a lien is unavailable even if the broker is known to the vessel or charterer; (5) whether a foreign supplier, as opposed to a foreign broker, is entitled to a maritime lien; (6) whether it makes a difference if the bunkering services were provided in a foreign port or an American port; and (7) how much difference it makes when the charterer or owner has failed to pay the fuel bill. Since the holding of *Tramp Oil*, district courts, and even some circuit courts, have walked through the doors left open by the First Circuit and have come to varied conclusions on when a corporation involved in the provision of bunkering services is entitled to a lien.

In *Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613, 617 (11th Cir.1992), the Eleventh Circuit, without substantial analysis, stated that "section 31342 does not provide for a maritime lien for goods and services supplied by a foreign plaintiff to foreign flag vessels in foreign ports." The court cited *Tramp Oil* and *Swedish Telecom Radio v. M/V Discovery I*, 712 F.Supp. 1542 (S.D.Fla.1988), for that proposition. Interestingly, while *Tramp Oil* clearly held that a foreign *broker* was not entitled to a lien, *see* 805 F.2d at 46, the Eleventh Circuit extended the analysis to foreign *suppliers* of necessaries. *See Trinidad Foundry*, 966 F.2d at 617; *see also Swedish Telecom*, 712 F.Supp. at 1546 ("[A] foreign supplier of goods is precluded from acquiring a lien under the Federal Act."). Also noteworthy is the fact that the Eleventh Circuit limited its holding to necessaries supplied in *foreign ports*. *Trinidad Foundry*, 966 F.2d at 617. *Tramp Oil* involved a foreign vessel and a foreign broker, but the fueling itself occurred in Savannah Georgia. *See* 805 F.2d at 44. Likewise, the court in

*Swedish Telecom* observed that a foreign supplier is not entitled to a lien "even if it supplies the goods or services in an American port." 712 F.Supp. at 1546.

Courts outside this jurisdiction have also struggled with the question of when a corporation involved in supplying fuel to a vessel is entitled to a maritime lien. In *Exxon Corp. v. Central Gulf Lines, Inc.*, 780 F.Supp. 191, 194 (S.D.N.Y.1991), the district court held that Exxon was a "provider of necessaries" under the Act even though it did not hold title to the fuel. In *Exxon Corp.*, the dispute arose over the fueling of the vessel Hooper in Jeddah, Saudi Arabia. The vessel was chartered by Waterman Steamship Corp. For forty years, Exxon was Waterman's exclusive supplier of bunker fuel. Exxon often provided its own fuel to Waterman and used local suppliers in ports where it did not have its own bunker stations. Exxon enlisted Arabian Marine Operating Co. to supply Hooper with fuel in Jeddah. Exxon paid Arabian for the fuel, but was not reimbursed by Waterman. *See id.* at 192. The court found that Exxon had furnished necessaries to Hooper within the meaning of the Act, despite the fact that it did not have title to the bunkers. *See id.* at 194. It appears that crucial to the district court's holding was the fact that Waterman and Exxon had a previous relationship in which Exxon directly supplied fuel to Hooper. *See id.* (" '[T]he only difference between the New York Delivery ... and the Jeddah delivery was that, in Jeddah, Exxon bought the fuels from a third party and had the third party deliver them to the Hooper.' ") (quoting *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991)). The district court did not comment on the fact that Exxon was an American broker/supplier rather than a foreign one. It also appeared to make no difference to the court whether or not the vessel's owner was aware of the transaction between the charterer and Exxon. Finally, the court failed in any way to reconcile its opinion with the First Circuit's holding in *Tramp Oil*. In fact, the First Circuit's opinion in *Tramp Oil* is not cited once in the case.

In *A/S Dan–Bunkering Ltd. v. M/V Zamet*, 945 F.Supp. 1576, 1578 (S.D.Ga.1996), the district court held that a foreign fuel broker was entitled to a maritime lien because it had a direct relationship with the charterer. The facts of the case are as follows: The vessel Zamet was chartered by Tradewind. Tradewind contacted DB, a foreign corporation, to supply Zamet with fuel while in San Francisco and Savannah. DB arranged for fuel to be supplied by Petro American in San Francisco and Colonial Oil in Savannah. DB paid both companies for the fuel, but was never reimbursed by Tradewind. *See id.* at 1577–78. In coming to the conclusion that DB was entitled to a maritime lien, the court relied on the holding of *Exxon Corp.*, 780 F.Supp. at 194, and the portion of *Tramp Oil* stating that it is "unfair to the vessel to extend the availability of a maritime lien directly to an intermediate broker unknown to the vessel." 805 F.2d at 46. The court reasoned that because "DB is not an intermediary supplier or unknown to the Zamet," it is entitled to a maritime lien. *A/S Dan–Bunkering Ltd.*, 945 F.Supp. at 1579. However, although the First Circuit in *Tramp Oil* held that one of the reasons Tramp was not entitled to a maritime lien was that it was unknown to the vessel, the court did not hold that any broker known to the vessel's charterer is entitled to a maritime lien. The district court in *A/S Dan–Bunkering Ltd.* appears to have considered the charterer's awareness of the broker as the *only* critical factor in determining whether or not a corporation involved in fueling is entitled to a maritime lien. The court does not discuss the fact that DB was a foreign corporation or whether or not Zamet was a foreign ship. The court also fails to mention the Eleventh Circuit's holding in *Trinidad Foundry* or the holding of the Southern District of Florida in *Swedish Telecom.*

■ At the end of the day, it is up to this Court to decide whether Polygon and Asamar have maritime liens on Anglia. As in many other areas of the law where different courts rely on different factors in their legal analyses of an issue (for example, the law of abstention), it is appropriate to devise a multi-factor test for determining when a corporation involved in the provision of necessaries to a vessel is entitled to a maritime

lien under the Act. Drawing on the relevant case law, and especially upon the First Circuit's holding in *Tramp Oil*, the Eleventh Circuit's holding in *Trinidad Foundry*, and this Court's holding in *Swedish Telecom*, the Court finds that the following factors favor recognition of a maritime lien:

1. The corporation asserting the maritime lien is an American, as opposed to foreign, corporation;

2. The corporation asserting the maritime lien had a direct relationship with the charterer;

3. The vessel was aware of the involvement of the corporation asserting the lien;

4. The corporation asserting the maritime lien has had an ongoing relationship with the charterer or vessel;

5. The vessel is an American, as opposed to foreign, flagged vessel;

6. The corporation asserting the maritime lien had title to the necessaries supplied; and

7. The vessel or charterer has failed to pay for the necessaries.

As with other multi-factor tests, courts should balance all the elements in determining whether a maritime lien has arisen. This Court declines to designate any one factor as alone necessary or sufficient for a maritime lien. It does appear, however, from the law of this Circuit that the most important factor is whether or not the corporation asserting the maritime lien is an American or foreign corporation.

■ Applying the test set forth above to the facts of this case, the Court will first determine whether Asamar has a valid maritime lien on Anglia. First, Asamar is a Bermuda corporation. Second, there is no evidence that Genesis had a direct relationship with Asamar. Although Plaintiff contends that Genesis was aware of Asamar's involvement, the parties agree that Genesis directly retained Polygon, not Asamar, for the fueling of Anglia. Third, there is no evidence that Owner was aware of the involvement of Asamar. Plaintiff contends that an officer of the vessel signed the bunker delivery receipts which designated Asa-

mar as the seller. However, even if the Court were to impute that officer's knowledge to the vessel, the relevant time for the vessel to be aware of a broker's involvement is before the fueling process takes place. Fourth, there is no evidence that Asamar had an ongoing relationship with either Genesis or Anglia. Fifth, Anglia is a foreign flagged vessel. Sixth, the record is unclear as to which corporation held title to the bunkers. Finally, it is true that Genesis failed to pay Asamar for the fuel. While the last factor favors recognition of a maritime lien, on balance, an analysis of the factors shows that Asamar is not entitled to a lien on Anglia for Genesis' failure to pay for the fuel provided on August 26, 1995 and September 11, 1995.

██ This is not the case, however, with Polygon. First and foremost, Polygon is an American corporation. Second, Polygon had a direct relationship with Genesis. Third, it again is not clear that Anglia was aware of Polygon's involvement. Fourth, Polygon had at least somewhat of an ongoing relationship with Genesis, having acted as fuel broker on two prior occasions. Fifth, it is true that Anglia is a foreign flagged vessel. Sixth, again it is not clear who held title to the fuel. Finally, Genesis failed to pay Polygon for the fuel. This is a harder case than with Asamar because some of the factors favor a lien and some bode against the existence of the lien. However, because the first factor is so important and because Polygon had a direct and ongoing relationship with Genesis, this Court finds that, on balance, the factors favor recognition of Polygon's lien against Anglia for Genesis' failure to pay for fuel provided on October 30, 1995.

### Conclusion

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Owner's Motion for Summary Judgment be, and the same is hereby, GRANTED in part and DENIED in part. It is further

ORDERED and ADJUDGED that Plaintiff's Motion for Summary Judgment be, and the same is hereby, GRANTED in part and DENIED in part. It is further

ORDERED and ADJUDGED that Plaintiff's claim based on Genesis' debt to Asamar (Count I) be, and the same is hereby, DISMISSED. It is further

ORDERED and ADJUDGED that Judgment be, and the same is hereby, ENTERED in favor of Plaintiff and against the vessel Anglia *in rem* for the amount of $24,376.00. The Court will assess prejudgment interest upon proper motion of the Plaintiff designating the method of calculating prejudgment interest, the rate at which the interest should be calculated, and the time period during which interest has accrued. *See Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff,* 913 F.Supp. 919, 929 (D.Md.1995). It is further

ORDERED and ADJUDGED that Owner's Motion to Strike be, and the same is hereby, DENIED as moot.