EXXON CORPORATION, Plaintiff,

v.

CENTRAL GULF LINES, INC., in personam and the M/V GREEN HARBOUR (ex William Hooper) in rem, her engines, boilers, tackle, etc. and a certain Letter of Credit No. P 621208 dated December 26, 1984 issued by the Chase Manhattan Bank, N.A., in rem, Defendants.

No. 86 Civ. 9445 (WCC).

United States District Court, S.D. New York.

Dec. 18, 1991.

Nourse & Bowles, New York City, for plaintiff; Armand M. Pare, Jr., Bradley F. Gandrup, Jr., of counsel.

Bigham Englar Jones & Houston, New York City, for defendants; Francis A. Montbach, Karin A. Schlosser, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

After a lengthy voyage to the highest court, plaintiff returns to this Court bringing this *in rem* action to enforce a maritime lien under the Federal Maritime Lien Act (the "Lien Act"), 46 U.S.C. § 971 (1982 Ed.)[1]. Plaintiff alleges that it has not been paid for bunker fuel supplied to defendant's vessel in Saudi Arabia and moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P.

### FACTS

Familiarity with the facts of this case as presented in this Court's previous two opinions is presumed. Only a brief recitation of the facts is thus presented.

Defendant Central Gulf Lines, Inc. ("Central Gulf") is the owner of a vessel, the *Green Harbour ex William Hooper* (the *"Hooper"*). The *Hooper* was chartered by a bareboat charter party to the Waterman Steamship Corporation ("Waterman").

For forty years, plaintiff Exxon Corporation ("Exxon") was Waterman's exclusive worldwide supplier of gasoline and bunker fuel oil. Under annually negotiated fuel oil supply contracts between Exxon and Waterman, Exxon provided marine fuel to all Waterman ships worldwide, either itself or, in locations where Exxon did not have its own bunker stations, through local supplying companies. These fuel supply contracts provided that Exxon would have a lien on the receiving ship for fuel supplied.

Whenever Exxon procured bunker fuel for Waterman vessels at port in Jeddah, Saudi Arabia, it used a local supplier, Arabian Marine Operating Co. Ltd. ("Arabian Marine"). Exxon's relationship with Arabian Marine was governed by the terms and conditions of a brokerage agreement which provided that "Exxon shall solicit and arrange for the sale of marine fuels to international customers having bunkering requirements at the port of Jeddah. Arabian Marine shall supply marine fuels to those customers nominated by Exxon." In return for Exxon's services, including the administrative task of invoicing and collecting from Waterman, Arabian Marine paid Exxon a commission.

From January 1982 until the fall of 1983, the Jeddah brokering agreement was suspended to allow Waterman to take advantage of "bargain" prices offered by Arabian Marine. The October 26, 1983 bunkering, for which Exxon now asserts a maritime lien, took place in a transitional period during which Waterman, Exxon and Arabian Marine were reverting back to the arrangement under the Exxon–Waterman bunkering agreement. In early October 1983, Arabian Marine informed Exxon that it refused to supply bunkers directly to Waterman due to Waterman's financial condition and suggested that the previous arrangement be restored. Exxon consented, guaranteeing payment on Waterman's then current order. Subsequent to the supply, Exxon was invoiced by Arabian Marine for the Jeddah delivery and Exxon paid the invoice. Exxon then invoiced Waterman in the amount of $763,644.60 but was not paid.

On December 1, 1983, Waterman sought reorganization under Chapter 11 of the Bankruptcy Laws in which proceeding Exxon has filed a claim for the full value. To date, Exxon has received certain cash and stock dividends in partial payment of Waterman's obligations, through the Waterman bankruptcy proceedings.

### PROCEDURAL HISTORY

Exxon commenced this action against Central Gulf *in personam* and against the *Hooper in rem*. Exxon claimed to have a maritime lien on the *Hooper* under the Lien Act for amounts claimed due by Waterman

---

1. The relevant portion of the Lien Act has been amended and recodified at 46 U.S.C. § 31342.

for fuel supplied at Jeddah and at New York. Upon Exxon's motion for summary judgment and Central Gulf's cross-motion to dismiss, this Court, in an opinion dated March 3, 1989, granted a lien for the New York delivery but dismissed the claim for the Jeddah delivery for lack of maritime jurisdiction, reasoning that while jurisdiction existed over the New York delivery because Exxon itself made the physical transfer, jurisdiction was lacking with respect to the Jeddah delivery because Exxon had acted as an agent and allowed Arabian marine to make the physical transfer. *See Exxon Corp. v. Central Gulf Lines, Inc.,* 707 F.Supp. 155 (1989). Under then applicable law, a claim under an agency contract was outside admiralty jurisdiction. *See Minturn v. Maynard,* 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1855); *Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.,* 739 F.2d 798 (2d Cir.1984).

In an opinion and order dated July 21, 1989, this Court denied Exxon's motion for reconsideration. *See* 717 F.Supp. 1029 (S.D.N.Y.1989).

In a Summary Order dated April 5, 1990, the Court of Appeals affirmed the judgment of this Court. *See* 904 F.2d 33 (2d Cir.1990).

The Supreme Court granted *certiorari* on January 14, 1991, and heard oral argument on April 15, 1991. By opinion announced on June 3, 1991, the Supreme Court overruled *Minturn v. Maynard* and held that admiralty jurisdiction did exist over Exxon's claim for the Jeddah delivery. *See Exxon Corp. v. Central Gulf Lines, Inc.,* — U.S. ——, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991).

Upon remand, the only remaining issue in the instant case is whether Exxon is entitled to a lien on the *Hooper* for amounts claimed due.

## DISCUSSION

### I. The Standard for Summary Judgment

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *Knight v. U.S. Fire Ins.* *Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight,* 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–10, 91 L.Ed.2d 202 (1986).

### II. Did Exxon Furnish Fuel?

■ Both parties agree that plaintiff's right to an *in rem* lien against the *Hooper* should be determined in accordance with § 971 of the Lien Act in effect on October 26, 1983, when the bunkers were supplied to the vessel. This section provided:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. [46 U.S.C. § 971 (1982 ed.)].

Defendant correctly notes that the Lien Act only protects those who "furnish" supplies, repairs or other "necessaries." Char-

acterizing Exxon's involvement as indirect and administrative, defendant argues that no such furnishing occurred here. However, plaintiff contends that even if Exxon's involvement here was indirect, it still constituted a furnishing under the applicable caselaw. In support, plaintiff cites two cases where plaintiffs prevailed under the Lien Act for oil delivered to a vessel, notwithstanding the fact that in each case plaintiff did not itself make the physical supply but arranged for it to be made by an unrelated local supplier. *See The Golden Gate*, 52 F.2d 397 (9th Cir.1931), *cert. denied sub nom., Knutsen v. Associated Oil Co.*, 284 U.S. 682, 52 S.Ct. 199, 76 L.Ed. 576 (1932); *Gulf Trading & Transport Co. v. M/V Tento*, 694 F.2d 1191 (9th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983). Plaintiff maintains that in each case, the Ninth Circuit found that such indirect involvement constituted a furnishing under the Lien Act and notes further that in its Opinion on the instant case, the Supreme Court cited with approval *The Golden Gate*, describing that case as one "entertaining an action in admiralty for the value of fuel oil furnished to a vessel." 111 S.Ct. at 2077.

In response, defendant attempts to distinguish these cases, arguing that in each, the fuel supplied was owned by the libelant whereas here Exxon never actually held title to the bunkers supplied to the *Hooper*. Defendant also contends that in *The Golden Gate*, the lienor was effectively the seller pursuant to a sales contract with the charterer, *see* 52 F.2d at 400, whereas here Exxon was not a seller in the same sense. These distinctions, however, are more technical than substantive. As the Supreme Court noted in its Opinion, "the only difference between the New York Delivery … and the Jeddah delivery was that, in Jeddah, Exxon bought the fuels from a third party and had the third party deliver them to the *Hooper*." 111 S.Ct. at 2077. While the Supreme Court's discussion was focussed on the question of jurisdiction, it has relevance in the present context. The Supreme Court noted that the New York and Jeddah transactions had the same effect on maritime commerce. Because, as

the Supreme Court has noted, even these two superficially dissimilar transactions are essentially analogous in the instant case, this Court is unconvinced by defendant's attempts to draw even narrower distinctions between the present case and those cases cited by plaintiff based on whether Exxon actually held title to the fuel or was technically a seller. The Court thus finds that Exxon did furnish bunkers to the *Hooper* within the meaning of the Lien Act.

### III. Did Exxon Furnish Credit?

■ Plaintiff asserts that the Court need not rest its decision solely Exxon's furnishing of fuel to defendant. Plaintiff argues that in addition to furnishing fuel, Exxon also "furnished" credit to enable the fuel supply to be made to the vessel. The furnishing of credit constitutes the furnishing of a necessary under the Lien Act. *See Universal Shipping, Inc. v. Panamanian Flag Barge*, 563 F.2d 483 (1st Cir.1976).

■ Nonetheless Central Gulf insists that despite Exxon's advancing of credit in the instant case, Exxon is not entitled to the relief it seeks because no lien may attach when the relationship between the one making the advance and the owner or charterer qualifies as a joint venture. *See Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204 (5th Cir.1978). Defendant insists that the relationship between Exxon and Waterman was a joint venture because: (1) The continuation of Waterman's business was essential if it was to repay the monies due to Exxon; (2) the advancement of additional credit by Exxon was an attempt to ensure Waterman's continued trading and (3) Exxon therefore had a stake in Waterman's business which it tried to protect. Central Gulf's reasoning is flawed, however. In the instant case there was no agreement between Exxon and Waterman to share in profits or losses nor was there any provision for joint control or joint right of control. Under such circumstances, no joint venture existed. *See ITEL Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990).

Central Gulf also argues that Exxon is not entitled to a lien because of its status as a general agent. However, as plaintiff notes, agents, including general agents, have long been held entitled to liens when they procure and pay for necessaries and their contract specifically reserves the right to a lien.[2] *See, e.g., The Kalorama,* 77 U.S. 204, 217, 19 L.Ed. 941 (1869); *P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. T.S. Salzachtal,* 373 F.Supp. 267, 276 (E.D.N.Y.1974). In the instant case, there is an express clause in the contract granting Exxon a lien. Agency status is therefore not a bar to a lien.[3]

## IV. Did Exxon Rely on the Credit of the Vessel?

Central Gulf acknowledges that the Lien Act presumes that the person furnishing supplies and necessaries to a vessel relies on the credit of the vessel. Central Gulf also concedes that it bears the burden of overcoming this presumption. In order to overcome this presumption, Central Gulf must establish that Exxon relied solely on the personal credit of Waterman or some other third party and not on the credit of vessel. *See, e.g., Gulf Oil Trading v. M/V Caribe Mar,* 757 F.2d 743 (5th Cir.1985). While noting that its burden is a difficult one, Central Gulf insists that it has met this burden. Central Gulf urges the Court to focus on several factors that it finds demonstrative of Exxon's intent to rely solely on the Waterman's personal credit: (1) Exxon's long relationship with Waterman; (2) Exxon's extension of additional credit to Waterman; (3) Exxon's inquiries concerning the possibility of obtaining addi-

tional security; and (4) Exxon's filing of a claim in bankruptcy.

In support of its contention that these factors are relevant, Central Gulf relies heavily on *Port of Portland v. M/V Paralla,* 703 F.Supp. 1446 (D.Or.1988), *aff'd,* 892 F.2d 825 (9th Cir.1989). In that case, the district court denied a lien for vessel repairs claimed by the operator of the Portland Ship Repair Yard. In determining that the plaintiff had waived its lien, the district court considered a number of factors including the long, close and mutually beneficial relationship between the Port and the vessel's agent; the Port's knowledge of the agent's deteriorating financial condition; and the Port's filing of a claim in bankruptcy and acceptance of a plan of payment.

Defendant's reliance on *The Paralla* is, however, misplaced. Central Gulf quotes extensively from the district court's opinion in that case but fails to mention that the district court's rationale was not adopted by the Ninth Circuit upon appeal. In *The Paralla,* the lien-claimant, the Port of Portland, had no contract with vessel interests and thus with any party authorized under the Lien Act to confer a lien against a vessel. The contract in question merely allowed shipyard contractors to use the Port's facilities. Thus, in reaching its holding that the Port "did not acquire a lien upon the vessel," the Ninth Circuit found that it "need not consider whether [the Port] waived a lien." *Port of Portland v. M/V Paralla,* 892 F.2d 825, 829 (9th Cir. 1989).

In the instant case, Exxon's contract was with the bareboat charterer, Waterman,

---

**2.** Central Gulf is correct, however, in insisting that Exxon's lien claim is without merit to the extent that it not only seeks reimbursement for monies advanced, but also attempts to have Central Gulf pay the $14,424.00 commission Exxon earned under the Exxon–Arabian Marine contract. No lien lies upon the vessel for commissions earned. *See, e.g., The J.C. Williams,* 15 F. 558 (S.D.N.Y.1883); *E.S. Binnings, Inc. v. M/V Saudi Riyadh,* 815 F.2d 660, 663 (11th Cir.1987).

**3.** Nor is the Court persuaded by Central Gulf's argument that Exxon's alleged failure to act in "good faith" prevents it from obtaining a lien.

Citing *Tramp Oil & Marine Ltd. v. Mermaid I,* 630 F.Supp. 630, 635 (D.P.R.1986), Central Gulf argues that Exxon did not acquire a lien in good faith because it did not provide credit and fuel to advance maritime commerce but merely as part of its contractual duties under the Arabian Marine bunkering agreement and its agency contract with Waterman. This argument is untenable. The plaintiff in *Tramp Oil* was a fuel broker rather than a supplier like Exxon. Thus, the case considered good faith in the context of plaintiff's subrogation claim, a claim inapplicable to the instant case because of Exxon's status as a supplier.

which, unlike the plaintiff in *The Paralla,* was authorized to confer a lien on the vessel under 46 U.S.C. §§ 971 and 972. The Exxon/Waterman contract, moreover, specifically grants Exxon a lien on the vessel for fuel supplied. The agreement at issue in the present matter is thus clearly distinguishable from the agreement in *The Paralla.*

More apposite here is *Gulf Oil Trading v. M/V Caribe Mar,* 757 F.2d 743 (5th Cir.1985). In that case, plaintiff Gulf Oil Trading supplied bunkers through a third party to a charterer of a ship owned by defendant. Defendant did not contest that plaintiff had furnished the oil but argued that plaintiff was relying solely on the personal credit of the charterer. In support of its position, defendant argued that plaintiff had a longstanding relationship and a substantial line of credit with the charterer. The Ninth Circuit was unpersuaded, holding that:

> the district court was fully justified in concluding that [defendant] failed to shoulder the heavy burden of proving a waiver through reliance on the personal credit of someone other than the vessel owner. The simple existence of a business relationship and credit arrangements could hardly be realistically construed as an intent or purpose by [plaintiff] to waive its lien on the vessel.

The Court finds that this reasoning is equally applicable to the instant case. Exxon's longstanding relationship with and willingness to extend additional credit to Waterman simply does not suffice to meet defendant's burden here.

Nor is this Court persuaded by Central Gulf's attempt to use Exxon's claim in bankruptcy as evidence of an intent to waive its lien.[4] Defendant neglects to mention that Waterman filed for bankruptcy within five weeks of the Jeddah supply; by reason of the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362, this filing prevented Exxon from liening the vessel.

Defendant also omits mention of the fact that Exxon quickly moved in the bankruptcy proceedings to lift the automatic stay so it could lien the vessel. Taken together, these facts establish that Exxon's actions in the bankruptcy proceedings are inconsistent with defendant's claim that Exxon waived its right to a lien, especially in light of the presumption favoring Exxon on this issue.

The Court notes lastly that even apart from the presumption in favor of Exxon contained in the Lien Act, there is affirmative evidence in the record tending to show that Exxon relied on the credit of the vessel. For example, James Sharkey, the Exxon bunker salesman in charge of the Waterman account, testified "as it is in our contract, it says that the sale is to the vessel and, yes, if push came to shove at the end of the day, Exxon could always go and lien the vessel." Sharkey Dep. at 85–86.

### CONCLUSION

In light of the foregoing, plaintiff's motion for summary judgment is granted insofar as it seeks impression of a lien against the vessel for monies advanced on Waterman's behalf and not yet recovered in the bankruptcy proceedings.

SO ORDERED.

---

4. The Court has also considered and rejected defendant's claim that Exxon's inquiries concerning the possibility of obtaining security, when considered with Exxon's other actions, manifest exclusive reliance on Waterman's cred-

it. As the procedural history of this case suggests, a maritime lien is not always the most efficient security and thus inquiries into additional forms of security are frequently warranted.