**BARWIL ASCA and Moran Towing & Transportation Division of Moran Towing Corp., Plaintiff,**

**v.**

**M/V SAVA, her engines, tackle, furniture, apparel, freights, etc., in rem, and Croatia Line, Malta Cross Shipping Co. Ltd., and Palm Star Shipping, Ltd., in personam, Defendants.**

**No. 97 CV 4105(NG).**

United States District Court, E.D. New York.

April 7, 1999.

Michael E. Stern, Nourse & Bowles, LLP, New York City, for plaintiff.

Mark C. Flavin, Carter, Ledyard & Milburn, New York City, for defendant.

## MEMORANDUM AND ORDER

GERSHON, District Judge.

Plaintiffs Barwil ASCA ("Barwil") and Moran Towing Corp. ("Moran") assert a claim for a maritime lien against the M/V SAVA ("the Vessel") *in rem*, as well as *in personam* claims against the Vessel's owner Croatia Line, its operator Malta Cross Shipping Co. ("Malta"), and its charterer, Palm Star Shipping Ltd. ("Palm Star"), which is the agent for an undisclosed principal, Queensgate Shipping ("Queensgate"). Plaintiffs move for summary judgment to enforce their maritime lien against the Vessel.

## FACTS

The following facts are undisputed: On or about June 20, 1997, defendant Palm Star, as time charterer of the M/V SAVA, engaged plaintiff Barwil to act as port agent for the Vessel in connection with the

Vessel's scheduled call to the Port of New York. Barwil requested advance payment from Palm Star prior to the Vessel's arrival. The Vessel entered New York harbor on June 29, 1997, at which time Barwil arranged for the services of Sandy Hook and Metropolitan Pilots ("the Pilots") to shift the Vessel to the Amstar terminal facility and from the terminal to anchorage after the completion of discharge. Despite not having received Palm Star's advance payment, Barwil's President, Charles Aitcheson, acknowledges that Barwil continued to provide services to Palm Star for seventeen days. Indeed, during this period, Barwil provided, made advances or arranged for the following necessaries to be provided to the Vessel: customs and immigration fees ($2,578.94), lines handlers ($1,179.78), launches to and from the Vessel ($41.60), harbor dues ($60.00), dockage at the Amstar terminal ($50,794.50), clerk hire ($3,178.38), cash advances to the Master and charts ($1,658.50), water supplied to the Vessel ($250), miscellaneous services including auto hire, telephone, fax, cables, telexes and postage ($1,909.41), and Barwil's agency fee ($5,650). Mr. Aitcheson stated that Barwil and its executives were not unduly concerned about Palm Star's failure to provide advance payment because it was not necessary in their business, where the vessel served as security, to obtain a deposit before furnishing necessaries.

In June and July of 1997, Moran provided the services of its tugs to move the Vessel to and from anchorage and the Amstar terminal facility; Moran is owed $5,160.40 for these services. In addition, Moran provided the services of its tugs to the Vessel in connection with a prior call to the Port of New York in or about April 1997 and its invoices in the amount of $3,854.20 remain outstanding.

On July 18, 1997, the M/V SAVA completed discharge and was moved to anchorage at the Bay Ridge Flats where it awaited sailing orders. At the close of business on that day, Barwil and Moran received a faxed letter from Palm Star advising them that the accounts of its principal, Queensgate Shipping, had been frozen by Croatia Line and that, as a result, plaintiffs should seek payment directly from Croatia Line and/or Malta.

Plaintiffs filed their verified complaint on July 19, 1997. A Warrant of Arrest was issued by this court on July 19, 1997 and served on the M/V SAVA by the U.S. Marshal Service. On July 21, 1997, the U.S. Marshal informed Barwil that a custodian would not be provided for the Vessel until Barwil arranged for the Vessel to be moved to a layberth. Accordingly, Barwil and Moran arranged for the M/V SAVA to be moved to a layberth for the duration of the arrest and paid all expenses incidental to the arrest: fees ($8,614.74), tugs ($2,227.75), lines handlers ($1,608.32) and layberth ($4,800). On July 28, 1997, the North of England Protecting & Indemnity Association Limited, the underwriter for defendants Malta and Croatia Line, issued a letter of undertaking in the amount of $120,000 in favor of plaintiffs, after which the Vessel was released from arrest pursuant to a stipulation.

## DISCUSSION

A motion for summary judgment is granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. See *id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). Rather, it must produce specif-

ic facts sufficient to establish that there is a genuine factual issue for trial. *Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**Maritime Lien**

Plaintiffs Barwil and Moran move for summary judgment to enforce a maritime lien against the Vessel *in rem.* Plaintiffs argue that this lien exists as a matter of law because of plaintiffs' provision of necessaries to the Vessel. Defendant M/V SAVA does not contest that Moran is entitled to summary judgment to enforce its maritime lien for towing services provided to the Vessel. Defendant argues, however, that Barwil is not entitled to a maritime lien against the M/V SAVA because Barwil improvidently extended credit to Palm Star.

The Maritime Commercial Instruments and Liens Act of 1988 ("Liens Act"), 46 U.S.C. §§ 31341–31342, provides in relevant part:

 [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a). To enforce a maritime lien *in rem* against the Vessel pursuant to 46 U.S.C. § 31342(a)(2), plaintiffs must show that: (1) they furnish[ed] repairs, supplies or other necessaries, (2) to any vessel, (3) upon the order of the owner of such vessel, or the person authorized by the owner. *See Integral Control Systems Corp. v. Consolidated Edison Co., Inc.,* 990 F.Supp. 295, 298 (S.D.N.Y.1998) (citation omitted); *see also Newport News Shipbuilding & Dry Dock Co. v. S.S. Independence,* 872 F.Supp. 262, 265 (E.D.Va.1994) (citations omitted). The term "necessaries" includes repairs, supplies, towage and the use of a dry dock or marine railway, and has been interpreted broadly to in-

clude any goods and services "reasonably needed" in a ship's business for a vessel's continued operation. *Newport News,* 872 F.Supp. at 265; *P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal,* 373 F.Supp. 267, 275 (E.D.N.Y.1974).

Barwil and Moran furnished supplies and other necessaries to the M/V SAVA upon the order of Palm Star, the time charterer of the Vessel, which is presumed under the Act to have authority to procure necessaries for the Vessel. 46 U.S.C. § 31341. Defendant argues that Barwil nonetheless should be barred from asserting a maritime lien against the Vessel because Barwil "ignored Palm Star's failure to supply promised funds for in excess of 17 days and continued to provide services to a time-chartered vessel in an improvident manner." Defendant relies primarily on *In re SeaEscape Cruises Ltd.,* 191 B.R. 944, 947 (S.D.Fl.1995), in which the court held that the claimant was barred from asserting a maritime lien where the customary time for the payment of invoices was thirty days and the lienor had allowed debt to accrue for between six to nine months. Defendant also relies on *Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515 (2d Cir.1979), in which the court found that a supplier of bunkers was guilty of laches where it allowed the shipowner to exceed its credit allowance and took no steps to arrest the vessel when she was in arrears, and *Tagaropulos v. S.S. Santa Paula,* 502 F.2d 1171, 1172 (9th Cir.1974), in which the court held that a ship chandler's maritime lien was barred by laches where the chandler could have arrested the ship on many occasions but where it waited over two years before taking any action to recover even a partial payment of the bill.

Essentially, defendant's argument is grounded in the defenses of waiver and laches. As for a waiver defense, the Liens Act presumes that the person furnishing supplies and necessaries to a vessel relies on the credit of the vessel. *Exxon Corp. v. Central Gulf Lines, Inc.,* 780 F.Supp. 191,

195 (S.D.N.Y.1991). "Waiver is not favored, and the courts will require a clearly manifested intention to forego the lien." *Newport News,* 872 F.Supp. at 267 (citations omitted); *Nacirema Operating Co., Inc. v. S.S. Al Kulsum,* 407 F.Supp. 1222, 1226 (S.D.N.Y.1975) (citation omitted). To overcome this presumption, defendant must establish that Barwil relied solely on the personal credit of Palm Star or some other third party and not on the credit of the Vessel. *Exxon Corp.,* 780 F.Supp. at 195.

■ Barwil's extension of credit to Palm Star did not constitute a waiver of its maritime lien. While Barwil's president, Charles Aitcheson, stated that Barwil requested advance payment from Palm Star, he also testified explicitly that "The vessel stands as security" and that "We have a ship in hand. That is our credit." That Barwil looked to Palm Star first for payment does not undermine plaintiff's statutory right to a maritime lien. *See Jan C. Uiterwyk Co., Inc. v. M/V Mare Arabico,* 459 F.Supp. 1325, 1333 (D.Md.1978) (That plaintiffs looked to the company for payment in the first instance and received some advance payments cannot overcome plaintiffs' statutory right to a maritime lien); *Nacirema,* 407 F.Supp. at 1226 (That plaintiff looked to the time charterer in the first instance, and that it rendered bills to the time charterer's general agent, which made an advance payment, are not sufficient to indicate that there was an implied waiver of its right to a lien against the ship should the time charterer and its agent be unable to pay for the services rendered). Thus, although Barwil extended credit to Palm Star for seventeen days and continued to provide services to Palm Star despite not having received a payment in advance, as requested, there is no evidence disputing the testimony that it was common to extend credit, and there is no basis for concluding that Barwil intended to waive its lien on the Vessel.

■ Laches also cannot be proved. Barwil exercised reasonable diligence in arresting the M/V SAVA. Barwil arrested the Vessel the day after it was notified that Palm Star could not render payment because its bank accounts had been frozen by Croatia Line, the owner of the Vessel. (Indeed, Croatia Line cannot complain of Barwil's not demanding payment from Palm Star when to do so would have been futile because of Croatia Line's own actions in freezing its time charterer's bank account.) Thus, Barwil acted in a timely manner to enforce its maritime lien against the Vessel.

■ Defendant also argues that certain miscellaneous services, specifically, Barwil's claims for auto hire, telephone, fax, cables, telexes, postage and the agency fee are "preliminary" and thus are not entitled to lien status. In *Exxon Corp. v. Central Gulf Lines, Inc.,* 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991), the United States Supreme Court's focus was on whether the services performed by an agent under an agency contract are maritime in nature. *Id.* at 611. Unquestionably, the miscellaneous services performed here by Barwil pursuant to a maritime contract between Barwil, the supplier/port agent, and Palm Star, the Vessel's time charterer, are maritime in nature. *See, e.g., P.T. Perusahaan,* 373 F.Supp. at 283–85. Even if the preliminary services contract doctrine continues to have independent validity after *Exxon,* as defendant argues and which plaintiffs dispute—a matter I need not resolve—these services clearly are not mere preliminary services. The services performed by Barwil did not predate Barwil's and Palm Star's maritime contract; nor is this a contract action with some tangential relationship to maritime affairs. Rather, it is an action to enforce a maritime lien, based on a contract between a supplier/port agent and a charterer for maritime services. Accordingly, the present action, in its entirety, falls within the maritime jurisdiction of this court and plaintiffs are entitled to a maritime lien for the services they performed to satisfy

their obligations under the maritime contract.

### In Custodia Legis Expenses

 Plaintiffs seek reimbursement of expenses *in custodia legis* which they incurred to protect the arrested M/V SAVA, specifically, the $8,614.74 that they paid to the U.S. Marshal in connection with the arrest of the Vessel and as payment to the custodian engaged by the U.S. Marshal to protect the Vessel during the arrest. Plaintiffs also seek reimbursement of $2,227.75 for Moran's charges in moving the Vessel into a layberth, $1,608.32 for the costs of lines handlers and $4,800 in dockage charges.

Services or property advanced to preserve and maintain an arrested vessel, furnished upon authority of the court, are allowable as *custodia legis* expenses. *See generally New York Dock Co. v. The Poznan*, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); *Turner & Blanchard, Inc. v. S.S. Emilia*, 322 F.2d 249 (2d Cir.1963); *Morgan Guar. Trust Co. v. Hellenic Lines Ltd., et al.*, 593 F.Supp. 1004 (S.D.N.Y. 1984). Plaintiffs' request for reimbursement of *in custodia legis* expenses is granted because these costs were incurred by plaintiffs to preserve and maintain the Vessel while it remained in custody.

### Prejudgment Interest

 In admiralty cases prejudgment interest "should be granted in the absence of exceptional circumstances." *Magee v. United States Lines, Inc.*, 976 F.2d 821, 822 (2d Cir.1992) (citations omitted). No such circumstances exist here, and defendant does not dispute that plaintiffs are entitled to prejudgment interest. Accordingly, such interest will be awarded.

It is within the broad discretion of the district court to determine the rate of interest and the date on which it commences. *Ind. Bulk Transp., Inc. v. Vessel "Morania Abaco"*, 676 F.2d 23, 27 (2d Cir.1982); *Standard Marine Towing Services, Inc. v. M.T. Dua Mar*, 708 F.Supp. 562, 569

(S.D.N.Y.1989). Here, interest shall be calculated on the average yield of six month Treasury Bills from July 18, 1997, a reasonable intermediate date, through the date of judgment. *See McCrann v. United States Lines, Inc.* 803 F.2d 771, 774 (2d Cir.1986); *M. Prusman Ltd. v. M/V NA-THANEL*, 684 F.Supp. 372, 374 (S.D.N.Y. 1988); *New England Petroleum Co. v. O/T SONJA*, 732 F.Supp. 1276, 1286 (S.D.N.Y. 1990).

### CONCLUSION

Plaintiff's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment against the M/V SAVA *in rem* in the total amount of $96,092.95, plus prejudgment interest as calculated in accordance with this order from July 18, 1997 to the date of judgment.

**SO ORDERED.**