**In re ALOHA RACING FOUNDATION, INC., Debtor.**

No. 00–02853–TOM–7.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Dec. 20, 2000.

## MEMORANDUM OPINION AND ORDER

TAMARA O. MITCHELL, Chief Judge.

■ This matter comes before the Court on a Joint Motion for Allowance of Compensation and/or Administrative Expense Pursuant to Section 503(b) and in Settlement or Compromise of a Controversy in Claim filed by John Kolius and the Chapter 7 Trustee on August 7, 2000. Appearing at the trial on November 28, 2000, were Lee R. Benton and Kyle Wise, counsel for John Kolius ("Kolius"), William Dennis Schilling, counsel for Chapter 7 Trustee Max C. Pope, Sr., Daniel D. Sparks, counsel for the debtor Aloha Racing Foundation, Inc. ("ARF" or "Debtor"), Jerry W. Schoel, counsel for James Bailey ("Bailey"), Thomas E. Reynolds, counsel for HealthSouth Corporation ("Health-South"), and J. Patrick Darby, counsel for Dr. James Andrews, M.D. ("Dr.Andrews"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) (1994)[1] and the district court's General Order of Reference Dated July 16, 1984, As Amended July 17, 1984.[2] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A) and (O).[3] This Court has considered the pleadings, testimony, exhibits, arguments of counsel and the law. Accordingly, this Court finds and concludes as follows.[4]

1. 28 U.S.C. § 1334(b) provides:
   Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
   28 U.S.C. § 151 provides:
   In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or by order of the district court.
   28 U.S.C. § 157(a) provides:
   Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for that district.

2. The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
   The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

3. 28 U.S.C. § 157(b)(2) provides:
   (b)(2)Core proceedings include, but are not limited to—
   (A) matters concerning the administration of the estate
   . . . .
   (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

4. This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

## 86

### I.  FINDINGS OF FACT[5]

The America's Cup Challenge is a series of sailing races held every three to four years between high-end yachts built within limited design parameters.  It is widely considered to be the most prestigious sailing event in the world.  The America's Cup Challenge is hosted by the previous winner.  The challenger for the America's Cup is determined through a series of qualifying races known as the Louis Vuitton Cup.  Several boats may compete in the Louis Vuitton Cup but only the winner ultimately races against the current champion in the America's Cup series.  In February and March of 2000, the Thirtieth America's Cup Challenge was held in Auckland, New Zealand following the Louis Vuitton Cup races in November and December 1999.

In the mid–1990's, James Bailey, a resident of California, became interested in challenging for the Thirtieth America's Cup and sought a crew and boat through his corporation, Bailko, Inc. ("Bailko").  Bailko formed the Aloha Racing Syndicate ("Syndicate") and recruited John Kolius[6] to be the Skipper and Sailing Director for the campaign.

Bailey, on behalf of the Syndicate negotiated an employment contract with Kolius ("the Contract") whereby Kolius would be paid a total of $550,000 at a monthly rate over approximately a three-year period.

(Movant's Exhibit 1).  The payments pursuant to the Contract were "back-end loaded" to accommodate cash flow problems which commonly occur in America's Cup campaigns.

As both Skipper and Sailing Director, Kolius's enumerated duties included acting as a liaison to the design and development teams for the boats[7], identifying and recruiting crew members, assisting the Syndicate in fund-raising and public relations and, of course, skippering the training and competition vessels in the Louis Vuitton Cup and hopefully also in the America's Cup itself.  The Contract also provided that Kolius would have other "unidentified responsibilities which would be on a 'mutually agreed upon basis.'" (Movant's Exhibit 1 ¶ 3).  The Contract does not include a provision for selling the Syndicate's assets at the conclusion of the campaign.  Kolius testified that based on his experience and understanding of the Contract, helping to sell the assets of ARF was not included in the Contract.  The objecting parties had no contrary testimony or evidence regarding the Contract.  This Court found Kolius to be a candid and credible witness with respect to all of his testimony.[8]

Shortly after the Contract was signed and Kolius began performing his duties for the Syndicate, all assets of the Syndicate were transferred to the Aloha Racing

---

**5.**  Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the contents of its own files.  *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir.1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir.1975).

**6.**  Kolius's reputation and accomplishments are well known in the sailing community.  Kolius testified that in 1976, he won a silver medal in the Olympics.  He has been sailing professionally since 1976 and has won World Championships.  As a skipper, Kolius has participated in three America's Cup campaigns since 1983.  In addition, he coached the Italian team that actually sailed in the America's Cup Challenge in 1993.  In 1995, he coached the first all-female team to sail in the Louis Vuitton qualifying series.

**7.**  Two boats were designed and built.

**8.**  Kolius was the primary witness and there were no other witnesses who testified about the Contract except Dale Baker, the Secretary–Treasurer of ARF and a HealthSouth representative, who was not involved in the Contract negotiations and whose testimony was limited to a Board of Directors' meeting and issues related to that meeting.  Also, the deposition of James Bailey was put into evidence in which Mr. Bailey stated that the sale of the assets was outside the scope of the Contract.  (Movant's Exhibit 31 pp. 54–56).  Bailey was the one who originally negotiated the Contract with Kolius.  Mr. Schilling also testified about his dealings with Kolius on behalf of the Trustee.

Foundation ("ARF"). This bulk transfer included the Contract with Kolius. Both Kolius and ARF continued to perform under the Contract until the ARF team was eliminated in the Louis Vuitton qualifying races.[9] Kolius remained in Auckland to oversee the dismantling and shipping of the ARF boats and related equipment to Houston by February of 2000. Even though pursuant to the Contract Kolius was to receive monthly payments through August 2000, Kolius was not paid after January of 2000. The trial testimony revealed that it is undisputed that he is owed $102,000 pursuant to the Contract.

On May 11, 2000, ARF filed a petition under chapter 7 of the Bankruptcy Code. Max Pope was appointed Trustee of ARF's estate and employed Dennis Schilling as his attorney. Mr. Schilling testified that in his attempts to liquidate the property of the estate on behalf of the Trustee, he spoke with several people about finding a buyer for the boats. Mr. Schilling also testified that he offered a ten percent commission to anyone who brought the ultimate buyer to the Trustee but he did not sign a contract with any of these potential "finders." Also, because he did not know who the ultimate "finder" would be and the value of the boats was rapidly declining due to the limited number of potential buyers and their need to obtain the vessels early in their challenge efforts, Mr. Schilling did not advise the potential finders that they needed to get approval from this Court before searching for a buyer. Kolius, who has no legal training, was not aware that he might need this approval before proceeding to find a buyer. On May 22, 2000, Team Sayanora, Inc. contacted Kolius about buying the assets of ARF. (Movant's Exhibit 16). Kolius helped negotiate a $2,000,000 sale price between the Trustee and Team Sayanora.[10] This price was the highest offer for the assets of ARF and after an appropriate motion was filed, this Court approved that sale on June 23, 2000. (Bankr.Proceeding No. 37).

Kolius filed a Proof of Claim for $302,000. This amount includes $102,000 claimed as a first priority lien on the proceeds of the vessels pursuant to the Contract and the Federal Maritime Lien Act found at 46 U.S.C. § 31342. The Claim also includes the $200,000 ten percent commission on the sale of the vessels. In an attempt to circumvent any dispute with the Trustee or other creditors, Kolius and the Trustee agreed to reduce the total amount payable to Kolius to $200,000. On August 7, 2000, Kolius and the Trustee filed a joint motion to have this Court approve the compromise. HealthSouth filed an objection on August 29 and Dr. Andrews filed an objection on September 11. Both objections allege that Kolius is not a disinterested person and has failed to satisfy the requirements for acting as a professional under 11 U.S.C. § 327(a). In addition, HealthSouth and Dr. Andrews contend that Kolius had agreed to sell the boats as part of his responsibilities as an employee of ARF. Kolius denies this contention and presented evidence to that effect.[11] No other objection to the settlement was filed.

## II. CONCLUSIONS OF LAW

### A. Standard for Approving the Compromise

■■■ It must be noted at the outset that the purpose of this trial was not to determine whether Kolius is owed the ten percent commission of $200,000. The proper inquiry is whether $200,000 is a fair and equitable settlement under the circumstances of this case. See Protective Com-

---

9. The ARF vessel, "Abracadabra 2000," finished seventh out of ten teams in the Louis Vuitton Cup. The Louis Vuitton Cup was won by Italy's "Prada", who sailed against Team New Zealand in the America's Cup Challenge. The America's Cup was successfully defended by Team New Zealand.

10. The ultimate price was determined by the Trustee and his attorney. Kolius was merely the middle man.

11. See supra page 4 and note 8.

*mittee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, 9 (1968), *reh'g denied,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968). *See also Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.),* 762 F.2d 185, 189 (2nd Cir.1985) (providing that the responsibility of the bankruptcy judge is to determine "whether the settlement falls below the lowest point in the range of reasonableness"). Rule 9019 provides this Court's authority to approve a settlement.[12] While Rule 9019 does not provide the standard for this Court to employ in reviewing a proposed settlement, the Eleventh Circuit has spoken on this issue. *See Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544 (11th Cir.1990), *cert. denied,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). The factors to be considered in approving a settlement are:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* at 1549 (citations omitted). These factors will now be considered in turn.

### B. Settlement Approval Factors

*1. Probability of Success in the Litigation*[13]

■ This Court must peer into the future to determine the likelihood that Kolius would prevail on an objection to his Proof of Claim for $102,000 in wages and $200,000 in commission in determining whether $200,000 is a reasonable settlement. The burden is not on Kolius and the Trustee to conclusively establish that he would be successful at a trial on these issues. That would defeat the purpose of settlement and would eliminate any cost savings from the settlement. "All that he must do is establish to the reasonable satisfaction of [this Court] that, all things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though it might be considerably less (or more) than were the case fought to the bitter end." *In re Golden Mane Acquisitions, Inc.,* 221 B.R. 963, 966 (Bankr. N.D.Ala.1997) (quoting *Florida Trailer & Equip. Co. v. Deal,* 284 F.2d 567, 573 (5th Cir.1960)).

■ It is undisputed that Kolius is owed approximately $102,000 for pre-petition wages under the Contract. Kolius alleges that this claim is secured by a maritime lien on the boats, and consequently the proceeds from the sale of the boats. HealthSouth denies that this lien is applicable and alleges that Kolius is merely a general unsecured creditor. Kolius's alleged lien attached, if at all, pursuant to the Federal Maritime Lien Act found in 46 U.S.C. § 31342 (1989). If the lien attached, it did so immediately when the debt arose, i.e., when the Contract became binding. *See Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 602 (5th Cir.1986), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986). Section 31342 provides:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

---

12. FED. R. BANKR. P. 9019(a) provides:
(a) COMPROMISE. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

13. There are three issues to be discussed under this factor: 1) Kolius's asserted maritime lien on the vessels and the proceeds of the sale thereof; 2) Kolius's asserted claim to a commission and that he is not a professional requiring court approval; 3) Kolius's allegation that he has a § 503(b) claim.

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342.

Thus, Kolius's first hurdle on the lien issue is to establish that he furnished repairs, supplies or other necessaries to the ARF boats. *See Barwil ASCA v. M/V Sava*, 44 F.Supp.2d 484, 487 (E.D.N.Y.1999) (citations omitted). The Act's definition of necessaries provides that "'necessaries' *includes* repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301 (emphasis added). This indicates that the definition is a non-exhaustive list. "Necessaries" has been "interpreted broadly to include any goods or services 'reasonably needed' in a ship's business for a vessel's continued operation." *Id.* (citing *Newport News Shipbuilding & Dry Dock Co. v. S.S. Independence*, 872 F.Supp. 262, 265 (E.D.Va.1994)). Another court has interpreted necessaries to include "most goods and services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function." *Equilease Corp.*, 793 F.2d at 603. Kolius would most likely be able to prove that he provided necessaries to the boats at a trial on this issue. He was both the Skipper and Sailing Director for the America's Cup campaign. His services were "reasonably needed" in designing, testing, supervising maintenance and skippering the vessels in the Louis Vuitton qualifying races. Kolius was responsible for hiring and training the crew. Both prior to and after the Louis Vuitton races, Kolius assisted in the dismantling and shipping of the boats to New Zealand and then back to the United States. Once the boats were stored in Houston, Kolius periodically checked on the boats to ensure everything was in order. Without making a specific finding on this issue, it certainly appears that Kolius's talents were not only reasonably needed, but also vital to this campaign.

Kolius must next prove that the boats were "vessels." The term is not defined by the Maritime Lien Act. However, "vessels" is defined in the General Provisions Title of the United States Code as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3 (1997). A craft does not have to be employed in commerce or even be employed in navigation to be a vessel. *See M/V Marifax v. McCrory*, 391 F.2d 909 (5th Cir.1968) (craft only needs to be "capable of being used" as transportation on water). The boats appear to be vessels within the meaning of the statute.

The third and final step to prove the existence of the lien would be for Kolius to show that the necessaries were provided upon the order of the owner or a person authorized by the owner. *See Barwil*, 44 F.Supp.2d at 487. As owner of the boats, ARF was authorized to procure necessaries or appoint someone to procure necessaries. 46 U.S.C. § 31341. If Kolius can prove his actions provided necessaries to the vessels, he was authorized to do so by ARF per the Contract which named him Skipper/Sailing Director and gave him all the aforementioned responsibilities.

It appears to this Court that Kolius has a substantial likelihood of prevailing in a hearing to determine whether he holds a maritime lien for his unpaid wages. Further, at the very least, he has a legitimate argument that his maritime lien continues beyond the sale of the boats and that he has a lien on the proceeds from the sale of the boats. Thus, there is a probability that Kolius could prevail on this lien issue.

With regard to the commission issue, there is substantial disagreement as to whether Kolius is owed a commission at all. HealthSouth asserts 1) that Kolius operated as a "professional" in finding a buyer for the boats and should not receive a commission because he failed to obtain court approval pursuant to § 327 and 2)

that Kolius's services were included in the amount due under the Contract.

Section 327(a) provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). Kolius is obviously not an attorney, accountant, appraiser or auctioneer. Therefore, to be considered a professional within the meaning of § 327 he must fall within the "other professional persons" category. *Id.* The term "professional" is not defined by the Bankruptcy Code. This Court must therefore look to other sources to determine the likelihood that Kolius could prove that he did not operate as a professional. Both Kolius and HealthSouth attempt to guide this Court in attempting to define professional by suggesting definitions promulgated by other bankruptcy courts. The parties urged the same definition by citing cases which provide that "professionals" includes only those persons who are "intimately involved in the administration of the debtor's estate." *In re Northeast Dairy Cooperative Federation, Inc.*, 74 B.R. 149, 153 (Bankr.N.D.N.Y.1987) (quoting *In re Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y.1981)).

Kolius maintains that he merely operated as a "finder" and was not a professional because he had no authority to bind the Trustee or the estate. *See In re Foundation Group Systems, Inc.*, 141 B.R. 196 (Bankr.E.D.Cal.1992) (a "finder" authorized to locate a buyer in exchange for a ten percent commission was not a professional under § 327). He argues that his only authorization was to find potential buyers for the Trustee and further that he

was under no obligation to do so. There was no contractual obligation with the Trustee and in fact there is no dispute that Mr. Schilling had communicated to several other potential finders that he would support them in their attempt to obtain a commission from the estate if they delivered the ultimate purchaser of the boats to the Trustee. Kolius contends that his involvement was only tangential to the administration of the estate so as not to render him a professional under § 327. *See Committee of Asbestos–Related Litigants and/or Creditors v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612, 620 (Bankr.S.D.N.Y.1986). Kolius also highlights the possibility that § 503 may be used to grant compensation even if he were to ultimately be found to be a professional. *See In re Grabill*, 983 F.2d 773, 777 (7th Cir.1993).

Conversely, HealthSouth asserts that Kolius was acting as a professional when he acted as an agent for the Trustee by brokering a deal between Team Sayanora and the Trustee. HealthSouth contends that Kolius should not get paid for his actions because he did not obtain court approval before trying to sell the boats. While it was ultimately up to the parties to reject or accept the deal, Kolius was involved in bringing about this meeting of the minds in much the same way a real estate agent would. HealthSouth alerts this Court to the fact that other courts have disregarded whether a claimant was licensed and looked to the nature of the services in determining whether the claimant was a professional. *See Northeast Dairy*, 74 B.R. at 153–154. HealthSouth contends that brokering a deal to dispose of essentially the only asset of the estate was certainly intimate involvement with the administration of ARF's estate. *See id.* Thus, they contend that Kolius's actions clearly fall within the *Seatrain* definition of professional. Alternatively, HealthSouth argues that the efforts by Kolius to

sell the boats were part of his contractual obligation and included in the total amount due pursuant to the Contract.[14]

This issue will certainly be hotly contested if the compromise is not approved by this Court. If HealthSouth were to prevail at a hearing on whether Kolius acted as a professional, the estate stands to gain approximately $100,000; however, if Kolius were to prevail at said hearing, the estate stands to lose approximately $100,000 above what is now being sought.[15] However, based upon the cases cited by the joint movants and the very credible testimony of Kolius, this Court believes that Kolius has a likelihood of prevailing on his non-professional status on these facts and that his efforts were not part of his contractual obligation but were additional.

Kolius further claims that the commission is due him as a § 503(b)(1)(A) administrative expense.[16] HealthSouth claims that Kolius is due no commission because he was either operating as an unapproved professional or as an employee of the Debtor and that he was only doing what he was obligated to do under the Contract. HealthSouth's argument is that his $102,000 claim for wages should encompass any efforts he undertook to sell the boats. Minutes of a Board of Director (the "Board") meeting for January 7, 2000, indicate that Kolius had been designated as the representative of ARF to sell the boats. (Movant's Exhibit 4(IV)(D)). Those Minutes also indicate that Kolius would not be paid a commission for these efforts. (Movant's Exhibit 4(IV)(D)). HealthSouth maintains that as the employee of ARF with the most specialized knowledge about the boats, Kolius was the most logical choice to serve as the contact point for the Foundation. In addition, Kolius was on the Board at the time this meeting was held and attended most meetings though admittedly most he attended by telephone and sometimes not for the entire meeting.

Kolius maintains that he never saw these Board minutes and was not in attendance during the portion of the meeting when this resolution was passed. There was testimony from both Kolius and Dale Baker that Kolius often attended Board meetings by cell phone and often hung up when the business of the meeting did not concern him. Kolius's testimony indicates that he assumes this is exactly what happened during the meeting in question. There is also a question of whether a quorum was even present at this meeting and thus whether or not the action taken at the meeting, the passage of the resolution, was valid.[17] Kolius further testified that it was customary in the America's Cup community for the person who brought the buyer to the table to receive a ten percent commission and that this was not a service or obligation performed by a skipper or sailing director in the performance of a contract. There was no agreement between Kolius and ARF for him to

---

**14.** See more discussion regarding this assertion *infra*.

**15.** Kolius has a claim for $302,000. It is undisputed that he is entitled to $102,000. If the compromise is approved he will receive $200,000. If the compromise is not approved, he will still receive the $102,000. The issue becomes whether he will get the $200,000 in commission, bringing his total to $302,000, or get no commission, leaving him with only the $102,000.

**16.** 11 U.S.C. § 503(b)(1)(A) provides:
(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

**17.** The Bylaws of ARF provide that a majority of the directors must be present to constitute a quorum. (Movant's Exhibit 6 § 4.13). Kolius testified that ARF had nine directors. The meeting minutes for January 7, 2000 indicate that four directors were present. (Movant's Exhibit 4 p. 1). The minutes also indicate that Doug DeVos, one of the Board members, had telephonically delegated his proxy to Dr. Andrews prior to the meeting. There is some question whether this proxy was allowed under the Bylaws of ARF.

sell the boats but he always assumed he would get paid because the sale was outside his scope of duties as Skipper and Sailing Director under the Contract. He testified that once the team was eliminated from the Louis Vuitton races, his obligations under the Contract ended. Although HealthSouth attempted to show that his responsibilities continued at least through August of 2000 when the last payment under the Contract was due, Kolius's testimony contradicts this position. Kolius also testified that Baker once sent him an e-mail suggesting that he sell the boats for free. Kolius testified that he rejected that suggestion. An e-mail from Baker to Kolius dated 5/11/2000 was also put into evidence which provided:

> JK,
>
> With the filing of bankruptcy today, you need to cease your negotiations for the sale of the boats for the time being. As soon as the court trustee is appointed, if you want us to, *we will recommend that you continue your expert sales efforts for a fee.* Counsel tells me it will be about two weeks before the trustee is appointed and functioning.
>
> Let me know your desires.
>
> Dale Baker

(Movant's Exhibit 14) (emphasis added). This e-mail was sent over four months after the Board meeting at which the resolution was allegedly adopted which purportedly designated Kolius as the selling agent for ARF. Further, James Bailey testified in his deposition that the sale of the boats by Kolius was outside the scope of the Contract and would have been the subject of a separate contract. (Movant's Exhibit 31 pp. 54–56). Since Bailey is the one who negotiated the Contract with Kolius, he is more qualified than HealthSouth to provide insight into what was covered by the Contract. Finally, Kolius testified that prior to the filing of the bankruptcy, he helped find a buyer for the boats without an agreement as to compensation because he had a long-standing relationship with Dr. Andrews and never imagined there would be a problem once the boats were sold.

Once again, a hearing on this issue would require extensive testimony and time. But based on what this Court has heard and seen it finds that there is a substantial likelihood that Kolius would prevail on this issue. For these reasons and those enumerated in the lien and § 327 discussions, this Court finds that approval of this settlement is in the best interest of all involved under this factor.

### 2. Difficulties of Collection

There is no evidence that there would be any difficulty in Kolius collecting the money from the estate. This factor must therefore weigh in favor of approving the compromise. *See Golden Mane,* 221 B.R. at 972.

### 3. Complexity of the Litigation Involved

The unresolved nature of the law on the issue of what constitutes a professional under the Bankruptcy Code and in this Circuit indicates that this litigation would certainly be complex. While this Court can define professional, the definition is a term of art and one could envision lengthy testimony, including expert testimony, at a trial on this issue which would also require an extensive finding of facts to determine whether Kolius fit into that definition. The same is true of a contest on the merits of Kolius's administrative expense claim. The fact that the issues are complex and the proceedings would take time does not automatically mandate approval of the compromise. However, this Court finds the settlement to be fair to all parties, a potential savings to the estate and an expeditious solution to the difficult issues that are presented (or would be presented) by the parties.

### 4. Paramount Interest of the Creditors

The final factor is the paramount interest of creditors and a proper deference to

their reasonable views in the premises. *Justice Oaks,* 898 F.2d at 1549. Although HealthSouth and Dr. Andrews both oppose this compromise, it may not be in their best interest to do so. If this compromise motion is denied, Kolius would no doubt pursue his claims for the full $302,000. If successful at a hearing on these claims, Kolius would be entitled to $102,000 over and above what this proposed settlement now provides. In addition, HealthSouth and Dr. Andrews would potentially be forced to spend substantially more time on discovery and money on attorney's fees at a hearing on Kolius's claims. Furthermore, the value of the estate would continue to be diminished by substantial attorney fees for counsel for the Trustee in litigating these complex issues.

No other creditors have objected to this settlement. These other creditors might share in any distribution from the estate along with HealthSouth and Dr. Andrews.[18] Approval of this compromise spares all parties the expense of further litigation on the issues described and potentially saves the estate over $100,000. Additionally, all creditors may be paid sooner rather than later if the compromise is approved. *See Golden Mane,* 221 B.R. at 974.

### III. CONCLUSION

This Court finds that the compromise is fair and equitable to both the creditors and the estate. If this settlement is not approved, substantial further time and expense await both the creditors and the estate. The future proceedings concerning Kolius's claims would be complex and could result in an even greater loss to the estate, and consequently the creditors. At the very least, this compromise certainly does not "fall below the lowest point in a range of reasonableness." *Anaconda–Ericsson, Inc.,* 762 F.2d at 189. Accordingly, it is hereby

18. There are other proceedings and matters to be resolved by this Court including a determination as to whether HealthSouth had a

**ORDERED, ADJUDGED AND DECREED** that the Objections to Joint Motion for Allowance of Compensation and/or Administrative Expense Pursuant to Section 503(b) and in Settlement or Compromise of a Controversy in Claim are **OVERRULED**. The Joint Motion is therefore **GRANTED** and the Compromise **APPROVED**.

valid perfected security interest in the boats and their proceeds.